(No. 45899

THE CITY OF CHICAGO, Appellee, v. CHARLES LOITZ *et al.*, Appellants.

*Opinion filed June 2, 1975.*

Lissner, Rothenberg, Reif and Barth, of Chicago (Henry B. Rothenberg, David A. Epstein, and Howard W. Carroll, of counsel), for appellants.

William R. Quinlan, Corporation Counsel, of Chicago (Daniel Pascale and Richard F. Friedman, Assistants Corporation Counsel, of counsel), for appellee.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

In a demolition suit filed by the City of Chicago for the removal of two deteriorated buildings from their property, Charles Loitz, Murray Loitz and Freida Loitz (counterplaintiffs) filed a counterclaim alleging that certain precondemnation activities of the City constituted a "taking" of the property obligating the City to pay counterplaintiffs the full value of the real estate. The circuit court of Cook County granted the motion of the City to dismiss a second amended counterclaim for failure to state a cause of action. The Appellate Court for the First District affirmed the dismissal (11 Ill. App. 3d 42), and we granted leave to appeal.

Essential to a determination of this cause is a detailed analysis of the counterclaim, the well pleaded facts of which are admitted by the motion to dismiss. (*Acorn Auto Driving School, Inc. v. Board of Education* (1963), 27 Ill.2d 93.) On July 11, 1966, the Chicago city council passed an ordinance authorizing realignment of East 76th Street and South Greenwood Avenue at the point of their intersection, which was the location of counterplaintiffs' property. One of their buildings was utilized as a gasoline service station while the other was apparently leased for commercial purposes. Four parcels of land, including that

of counterplaintiffs, were required for the project. The Commissioner of Public Works was authorized to negotiate with the property owners for the purchase of their property and, if agreement was reached, to purchase it for the agreed price, subject to the approval of the city council. If agreement could not be reached, the corporation counsel of the City of Chicago was authorized to institute condemnation proceedings for the purpose of acquiring title to the four parcels under the City's power of eminent domain.

On December 23, 1966, the Commissioner of Public Works sent a letter to counterplaintiffs advising them of the project and offering them $70,000 for their property. The letter stated that a failure to reply within 10 days would be treated as a rejection of the offer, necessitating the institution of condemnation proceedings to acquire the property. Upon receipt of the letter, counterplaintiffs entered negotiations with the City, resulting in a higher offer of $82,000 on or about March 7, 1967. This offer apparently was made orally, the pleadings alleging only that it was made by authorized agents of the City. Through their attorney, counterplaintiffs accepted the $82,000 offer in a letter to the Bureau of Engineering dated March 7, 1967.

The City acquired or filed condemnation proceedings to acquire the other three parcels, but took no further action with reference to preparing a contract to purchase counterplaintiffs' property. Nor were condemnation proceedings ever commenced, apparently because the project was abandoned, although that is not entirely clear from the record, and no notice of abandonment was given.

Counterplaintiffs were originally engaged in negotiations with their gasoline supplier for funds to remodel their gasoline station. Since the proposed street-realignment project was common knowledge among land owners, tenants, businessmen and realtors in the area, the gasoline supplier not only terminated those negotiations but also

refused to continue supplying counterplaintiffs with gasoline for resale at their station.

After alleging the foregoing facts, the counterclaim states:

"16. The above-described acts of counterdefendant caused counterplaintiffs' tenant to leave the property, caused the destruction of counterplaintiffs' business thereon, caused the property to become unoccupied and unsalable and resulted in destruction of the improvements on the property by vandals.

17. *By or before March 31, 1967,* the aforesaid acts by or on behalf of counterdefendant City of Chicago constituted a *taking* of plaintiffs' above-described property." (Emphasis added.)

Counterplaintiffs then alleged the March 31 property value to have been $83,500, the failure of the City to compensate them as required by both the Federal and State constitutions and prayed for judgment in the amount of $83,500 plus interest from March 31, 1967.

The demolition action, out of which the counterclaim arose, was filed by the City in 1969, apparently after counterplaintiffs had failed to correct numerous building code violations caused by vandalism to the buildings on the property. As a result of the action, the buildings have in fact been demolished.

Since condemnation proceedings were never instituted and a *de jure* "taking" could not have occurred, the counterclaim states a cause of action only if the City's actions prior to April 1, 1967, constituted a *de facto* "taking" of the property. Although counterplaintiffs' precise theory of this case is somewhat difficult to ascertain, it is at least clear from their reply brief that the existence of the alleged price agreement with the City is the crucial factor in their argument that a *de facto* "taking" occurred. They state that the "facts of this case go substantially beyond the stages of governmental planning, open discussions of proposed public improvements, formal adoption of planned improvements, and even

publication and dissemination of an adopted plan," conceding that "those sorts of precondemnation activities [do not] yield any liability on the part of a condemning agency." They concede that a "formal written contract independently valid at common law was not executed in this case because the City reserved to itself a right of prior approval of any such contract," but urge that the price agreement itself is sufficient to constitute a "taking" and that it was at that point that liability arose.

We do not agree, for, although the Illinois Eminent Domain Act (Ill. Rev. Stat. 1973, ch. 47, par. 2) contemplates that property should be taken by agreement if possible, it contains no suggestion that the law of contract should be altered to render enforceable a price agreement which has not been reduced to the form of a written contract for the sale of land. What occurred here regarding the property sale represented only the result of price negotiations preliminary to the execution of a formal agreement. There is no allegation that other aspects of a purchase, such as the date upon which possession would be surrendered, or liability for property taxes, *etc.,* normally included in a final contract, had been agreed upon. Clearly, agreement upon price alone constitutes neither an enforceable contract nor a "taking" indirectly compensable in the manner here attempted. Nor do we believe the totality of the City's activities constituted a "taking" as that term is used in the Constitution.

It is apparent, of course, that property values may be, and frequently are, affected by preliminary planning of public improvement projects. It is not uncommon that proposed projects for various reasons are abandoned prior to the institution of condemnation proceedings. In such cases the value of property which would have been affected by the proposed project may have been adversely affected by the pendency of the project, as was the property of counterplaintiffs in this case. While it is not entirely clear that counterplaintiffs did all that might have

been done to protect and preserve the value of their property, appealing arguments can be presented for compensation by the owners of property, the value of which is lessened as a result of proposed and subsequently abandoned public improvement projects. There are, however, persuasive countervailing considerations, many of which are stated in the City's brief. They include the fact that imposition of liability for precondemnation activities would tend to inhibit free and open discussion of proposed public improvements; that such activities provide notice to those in the area that their future plans may be affected; that the absence of liability for the ordinary precondemnation activities promotes flexibility in public planning and recognizes the difficulties inherent therein under present-day conditions in which large portions of public projects are financed from Federal funds, the availability of which, when needed, is less than certain; and that the problems involved in determining the date upon which a *de facto* taking occurred, were that principle to be recognized, are substantial.

Courts are not in complete agreement as to the circumstances under which Federal and State constitutional provisions obligate a condemning authority to compensate the owners of property so affected. The general rule followed in Illinois and most other jurisdictions is that mere planning or plotting in anticipation of a public improvement does not constitute a "taking" or damaging of the property affected. (*Chicago Housing Authority v. Lamar* (1961), 21 Ill.2d 362; *Eckhoff v. Forest Preserve District* (1941), 377 Ill. 208; see Annot. (1971), 37 A.L.R.3d 127, 132-34, for a listing of cases from other jurisdictions.) A distinct minority of both Federal and State courts have held various precondemnation activities sufficient to constitute a *de facto* "taking" of private property. (*Foster v. City of Detroit* (6th Cir. 1968), 405 F.2d 138; *Foster v. Herley* (6th Cir. 1964), 330 F.2d 87; *Drakes Bay Land Co. v. United States* (U.S.

Ct. Cl. 1970), 424 F.2d 574; *R.J. Widen Co. v. United States* (U.S. Ct. Cl. 1966), 357 F.2d 988; *Eleopoulos v. Richmond Redevelopment Agency* (N.D. Cal. 1972), 351 F. Supp. 63; *Haczela v. City of Bridgeport* (D. Conn. 1969), 299 F. Supp. 709; *Inmobiliaria Borinquen, Inc. v. Garcia Santiago* (D. Puerto Rico 1969), 295 F. Supp. 203; *Sayre v. United States* (N.D. Ohio 1967), 282 F. Supp. 175; *In re Elmwood Park Project* (1965), 376 Mich. 311, 136 N.W.2d 896; *Conroy-Prugh Glass Co. v. Commonwealth Department of Transportation* (1974), 456 Pa. 384, 321 A.2d 598; *In re Philadelphia Parkway* (1915), 250 Pa. 257, 95 A. 429; *In re Commonwealth's Crosstown Expressway* (1971), 3 Pa. Cmwlth. 1, 281 A.2d 909.) As counterplaintiffs admit, none of the minority decisions is directly on point, all involving behavior by the condemning authority substantially more prejudicial than that of the City in this case.

We are satisfied that the earlier decisions of this court in *Lamar* and *Eckhoff* were soundly based, and we believe them dispositive of the issue here. In *Lamar,* the Chicago Housing Authority had filed suit on September 23, 1959, to condemn 32 parcels of land, including that of defendants, for use in the development of a low-rent housing project. A jury verdict allowed defendants only $1,000 for their property, but they claimed, in a petition which the trial court denied leave to file, that they were entitled to additional compensation due to the precondemnation activities of the Housing Authority. They had been informed of the project by letter in August, 1956. On March 30, 1957, they had sold the property on a real estate installment contract for $6900, but the buyers apparently forfeited their contract and moved on November 11, 1958, perhaps because condemnation of the property was imminent. On November 7, 1958, defendants and the Housing Authority had orally agreed on a voluntary conveyance for $3250. An executed written offer was returned to the Housing Authority on November

10, but on November 12 the Housing Authority sent defendants a letter cancelling the offer because the property had been vacated and the subject of vandalism. Thus, as in the present case, there existed a price agreement which was never incorporated into an enforceable contract. The defendants alleged that, as a result of the precondemnation activities of the Housing Authority, their property and other buildings in the neighborhood became vacant and vandalized, some buildings were acquired by the Authority and demolished, and the neighborhood consequently became so undesirable that it was difficult to find tenants, with the result that defendants' property depreciated greatly in value.

*Lamar* involved a condemnation proceeding filed by the condemning authority. To that extent it differs from this case. However, the *Lamar* defendants had prayed that the court find that a "taking" of their property had occurred on November 7, 1958, the date of the unenforceable oral price agreement, some 10 months prior to the filing of the condemnation proceeding. After first rejecting defendants' second contention that the Housing Authority be required to pay damages for their precondemnation activities, this court held that the date of the "taking" was the date of filing the petition to condemn, not the earlier date of the price agreement.

As earlier indicated, we consider *Lamar* and *Eckhoff* controlling here, particularly since the City's precondemnation activities in this care were clearly less harmful than those of the condemning authorities in those cases.

Counterplaintiffs, however, urge that *Lamar* and *Eckhoff* were overruled by the 1972 addition of section 9.7 to our Eminent Domain Act. That section provides:

> "Except as to property designated as possessing a special use, the fair cash market value of property in a proceeding in eminent domain shall be the amount of money which a purchaser, willing but not obligated to buy the property, would pay to an owner willing but not

obligated to sell in a voluntary sale, which such amount of money shall be determined and ascertained as of the date of filing the petition to condemn. Provided that in the condemnation of property for a public improvement there shall be excluded from such amount of money any appreciation in value proximately caused by such improvement, and any depreciation in value proximately caused by such improvement." Ill. Rev. Stat. 1973, ch. 47, par. 9.7.

It is unnecessary in this case to consider the purpose of this amendment, for it was not adopted until long after the date of the "taking" alleged to have occurred here, and it contains no language indicating an intent that it apply other than prospectively. *In re Estate of Krotzsch,* 60 Ill.2d 342, 345.

The City has also argued that the second amended counterclaim was properly dismissed because counterplaintiffs failed to serve notice upon the City pursuant to the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1965, ch. 85, pars. 8—101, 8—102 and 8—103). In view of the foregoing, no consideration of this additional point is necessary.

Since counterplaintiffs' second amended counterclaim, alleging a "taking" of their property by or before March 31, 1967, does not state a cause of action, it was properly dismissed by the trial court. The judgment of the appellate court is affirmed.

*Judgment affirmed.*