**WESTGATE, LTD., Robert L. Randolph, Bank One, and Deposit Insurance Bridge Bank, Petitioners,**

v.

**STATE OF Texas and City of Austin, Respondents.**

No. D–0732.

Supreme Court of Texas.

Dec. 2, 1992.

Rehearing Overruled, Dec. 2, 1992.

Dissent on Motion for Rehearing Dec. 2, 1992.

Separate Dissenting Opinions Filed July 1, 1992.

---

**450**

Carole Tower, John McClish, Austin, for petitioners.

Iris J. Jones, Barney L. Knight, Thomas M. Pollan, James Noble Johnson, Austin, for respondents.

## OPINION

PHILLIPS, Chief Justice.

Petitioners' motion for rehearing is overruled. Our opinion of July 1, 1992, is withdrawn and the following is substituted in its place.

This is a condemnation case with a counterclaim by the landowner for inverse condemnation. The primary issue is whether a landowner may recover damages for inverse condemnation under Tex. Const. art. I, § 17 where the government has not physically appropriated, denied access to, or otherwise directly restricted the use of the landowner's property. Our answer is no, and we affirm the judgment of the court of appeals. 798 S.W.2d 903.

## I

Westgate, Ltd.,[1] purchased a tract of land in Austin for commercial development in September 1984. Westgate began constructing a shopping center on the property in April 1985, and had substantially completed construction of the project by October of that year. About the time construction was completed, Westgate learned that the State of Texas and City of Austin (collectively the "government") planned to widen U.S. Highway 290, which ran adjacent to the Westgate property, so that the new highway right-of-way would cross the Westgate property. Robert L. Randolph, one of the Westgate general partners, first learned of the proposed highway project from a newspaper article published on October 20, 1985.[2] The State Department of Highways and Public Transportation soon confirmed to him that the proposed route of Highway 290 not only crossed the Westgate property, but passed directly through one of Westgate's newly constructed buildings.

The government had been considering plans to expand Highway 290 at least since 1984, and the Highway Department approved the project in either late 1984 or early 1985. Nevertheless, when the Highway Department approved Westgate's site plan in February 1985, it gave no notification about the project. Likewise, the Austin City Council authorized the project in February 1985, but the City Planning Department approved Westgate's site plan and issued a building permit in March 1985 without any warning to Westgate.

The proposed highway expansion hurt Westgate's ability to lease its shopping center. Tenants were reluctant to lease space

---

1. Westgate, Ltd., is a limited partnership composed of two general partners, Robert L. Randolph and Bob Johnson, and four individual limited partners.

2. The record does not disclose when the other Westgate partners learned of the highway project, but there is no contention that anyone associated with Westgate had knowledge of the project prior to October 20.

that might soon be condemned or, at the least, impacted by nearby construction. Randolph attended a public meeting on the proposed highway expansion in February 1986 and learned from Highway Department officials that it might be "quite a while" before the project received final approval and right-of-way acquisition commenced. Because the government sought federal assistance for the project, it was required to conduct the exhaustive environmental review process mandated by federal law. *See* 42 U.S.C. § 4332. Although this process was initiated in early 1986, the final environmental impact statement was not approved by the Federal Highway Administration until October 1988.

In July 1986, Westgate asked the government to expedite acquiring that portion of Westgate's property needed for the new highway. Charles Muery, a supervisor of right-of-way acquisition for the Highway Department, testified that the Highway Department tries to accommodate such requests whenever the landowner demonstrates that a pending project is causing severe financial hardship. On Muery's recommendation, the Highway Department approved Westgate's request for expedited acquisition in November 1986. The government submitted an offer to Westgate for the needed property in June 1987, but Westgate rejected this offer and the parties did not subsequently agree on a price. The record does not disclose whether there were subsequent negotiations concerning purchase of the property or additional offers or counter-offers.

The government commenced the actual condemnation proceedings against Westgate in September 1988. Westgate counterclaimed for inverse condemnation, seeking to recover its lost profits for the period between the announcement of the highway project in October 1985 and the government's actual acquisition of the property on January 5, 1989.[3] According to Westgate, the government appropriated Westgate's property during this period by 1) failing to warn Westgate of the highway expansion before the shopping center was built, and 2) unreasonably delaying acquisition of Westgate's property after the highway project was announced.

At trial, the jury found not only that the government was negligent in not warning Westgate, but that it unreasonably delayed acquisition of the property. The trial court awarded Westgate $633,000 on the inverse condemnation claim, in accordance with the jury's award of lost profits.

The court also awarded $2,734,000 to Westgate as damages on its statutory condemnation claim. To determine the statutory damages, the trial court submitted two questions to the jury, one asking the value of Westgate's entire tract without considering the highway project, and the other asking the value of Westgate's remaining portion not taken by the government. The difference between the amounts found by the jury was $2,524,000, but the trial court increased the award by $210,000 because the court concluded that the jury's answer to the first question was lower than the evidence would support.

The court of appeals reversed and rendered judgment against Westgate on the inverse condemnation claim. The court of appeals held that no compensable taking existed until the government's actual acquisition of the property, as the government had not committed any of the actions constituting inverse condemnation before that date. The court noted that "the failure to notify and undue delay of which [Westgate] complains do not rise to the requisite level of interference with access to or use and enjoyment of its property." 798 S.W.2d at 907. Furthermore, the court held that the trial court erred in submitting two separate valuation questions to determine the statutory condemnation damages. Relying on our opinion in *Callejo v. Brazos Electric Power Cooperative, Inc.*, 755 S.W.2d 73 (Tex.1988), the court reversed and remanded for a new trial on these damages.

3. The government actually acquired Westgate's property when it deposited with the court the value of the condemned property as determined by the special commissioners. *See* Tex.Prop. Code § 21.021(a).

## II

### A

Tex. Const. art. I, § 17 provides that "[n]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made...." Generally, the government compensates the owner before appropriating property, either by paying a mutually agreed price or by paying the value as determined in a statutory condemnation proceeding. *See* Tex.Prop.Code § 21.042. If, however, the government appropriates property without paying adequate compensation, the owner may recover the resulting damages in an "inverse condemnation" suit. *See, e.g., City of Austin v. Teague,* 570 S.W.2d 389 (Tex.1978); *City of Abilene v. Burk Royalty Co.,* 470 S.W.2d 643 (Tex. 1971). An inverse condemnation may occur when the government physically appropriates or invades the property, or when it unreasonably interferes with the landowner's right to use and enjoy the property, such as by restricting access or denying a permit for development. *See Teague,* 570 S.W.2d 389; *City of Waco v. Texland Corporation,* 446 S.W.2d 1 (Tex.1969); *DuPuy v. City of Waco,* 396 S.W.2d 103 (Tex.1965). As in statutory condemnation, the appropriated property must also be applied to public use. Tex. Const. art. I, § 17; *Dallas County Flood Control Dist. v. Benson,* 157 Tex. 617, 620, 306 S.W.2d 350, 351 (1957).

The issue here is whether there was a taking or damaging of Westgate's property within the meaning of art. I, § 17 prior to January 5, 1989. The specific legal question presented is whether there can be a taking or damaging under art. I, § 17 where the government has not directly restricted use of the landowner's property. "Direct restriction," as used herein, refers to an actual physical or legal restriction on the property's use, such as a blocking of access or denial of a permit for development. It is undisputed that the government did not directly restrict use of Westgate's property prior to January 5, 1989; rather, the damage which Westgate suffered before then resulted from a decline in the marketability of the property caused by the government's proposal to condemn in the future.

This Court has not previously addressed this issue. Our courts of appeals, however, have held that a landowner may not recover economic damage caused by the government's public announcement of plans to condemn property in the future, where the government has imposed no current, direct restriction on the property's use. *See City of Houston v. Biggers,* 380 S.W.2d 700 (Tex.Civ.App.—Houston 1964, writ ref'd n.r.e.), *cert. denied,* 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965); *State v. Vaughan,* 319 S.W.2d 349 (Tex.Civ. App.—Austin 1958, no writ).

In *Biggers,* the city passed an ordinance authorizing construction of a civic center on the landowner's property. The court held that passage of the ordinance did not constitute a taking because the ordinance did not legally restrict use of the property, even though as a practical matter it hurt the property's marketability. "The fact that at some future time land might be taken under eminent domain, even where the threatened taking is imminent, is but one of the conditions on which an owner holds property." 380 S.W.2d at 704.

Likewise, the court in *Vaughan* refused to find a taking where tenants vacated the landowner's building because the property had been slated for future condemnation. The court noted that "[t]he mere fact that tenants learn of contemplated condemnation and because of such information elect to vacate the property does not afford the owner the right to recover damages from the state because there has been neither a taking or any character of a physical invasion of the property." 319 S.W.2d at 354.

Similarly, our courts of appeals have determined that government action which may result in a future loss of property does not give rise to a present cause of action under art. I, § 17, in the absence of a current, direct restriction on the property's use. *See Allen v. City of Texas City,* 775 S.W.2d 863, 865 (Tex.App.—Houston [1st Dist.] 1989, writ denied); *Hubler v. City of*

*Corpus Christi,* 564 S.W.2d 816 (Tex.Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.).

In *Allen,* the city constructed a rainwater levee that rendered the landowner's property more susceptible to flooding, although no flooding had yet occurred. The landowner argued that the completed levee interfered with use of his property because it diminished the market value by 50 per cent. The court, however, concluded that the landowner failed to show present interference with use of the property. "[N]either a fall in fair market value, nor an increased susceptibility to flooding, constitutes an actual physical appropriation or invasion of property, or an unreasonable interference with the land owner's use or enjoyment of the property." 775 S.W.2d at 865.

*Hubler* is similar to *Allen.* The city proposed a new drainage system that, if implemented, would increase the flooding of the landowner's property. The proposed system had the *present* effect of reducing the market value of the property. The court nonetheless held that no constitutional taking had occurred since the property itself had not as yet suffered flooding damage. 564 S.W.2d at 821. The impact of the future project on the present market value of the land was a noncompensable consequential damage. *Id.*

In the decisions cited by Westgate, the condemning authority directly restricted present use of the property, rather than threatening some possible future loss. *See Teague,* 570 S.W.2d 389 (denial of permit for development); *Texland,* 446 S.W.2d 1 (material and substantial denial of access caused by construction of viaduct adjacent to property); *San Antonio River Authority v. Garrett Brothers,* 528 S.W.2d 266 (Tex.Civ.App.—San Antonio 1975, writ ref'd n.r.e.) (denial of permit for sewer installation). These decisions are not applicable to the facts before us.

Other jurisdictions have likewise concluded that publicly targeting a property for condemnation, resulting in economic damage to the owner, generally does not give rise to an inverse condemnation cause of action unless there is some direct restriction on use of the property. *See Kirby Forest Indus. v. United States,* 467 U.S. 1, 14–16, 104 S.Ct. 2187, 2196–2197, 81 L.Ed.2d 1 (1984); *Littman v. Gimello,* 115 N.J. 154, 557 A.2d 314 (1989), *cert. denied,* 493 U.S. 934, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989); *Hood v. Chadick,* 272 Ark. 444, 615 S.W.2d 357 (1981); *Sproul Homes of Nevada v. State,* 96 Nev. 441, 611 P.2d 620 (1980); *City of Chicago v. Loitz,* 61 Ill.2d 92, 329 N.E.2d 208 (1975); *Orfield v. Housing & Redevelopment Authority,* 305 Minn. 336, 232 N.W.2d 923 (1975); *Empire Construction, Inc. v. City of Tulsa,* 512 P.2d 119 (Okla.1973), *cert. denied,* 414 U.S. 1094, 94 S.Ct. 725, 38 L.Ed.2d 551 (1973); *Bakken v. State,* 142 Mont. 166, 382 P.2d 550 (1963).

Sound public policy supports this result. Construction of public-works projects would be severely impeded if the government could incur inverse-condemnation liability merely by announcing plans to condemn property in the future. Such a rule would encourage the government to maintain the secrecy of proposed projects as long as possible, hindering public debate and increasing waste and inefficiency. *See Loitz,* 61 Ill.2d at 96, 329 N.E.2d at 211 ("[I]mposition of liability for precondemnation activities would tend to inhibit free and open discussion of proposed public improvements...."). After announcing a project, the government would be under pressure to acquire the needed property as quickly as possible to avoid or minimize liability. This likewise would limit public input, and forestall any meaningful review of the project's environmental consequences. The government also would be reluctant to publicly suggest alternative locations, for fear that it might incur inverse condemnation liability to multiple landowners arising out of a single proposed project. Failing to consider available alternatives is not only inefficient, but is at odds with proper environmental review. *Cf.* 42 U.S.C. § 4332(2)(C)(iii) (federal agency must consider alternatives to proposed actions significantly affecting the environment).

B

Westgate argues that even if the government's pre-condemnation activities generally do not constitute a taking, they should constitute a taking where the government *unreasonably delays* the actual acquisition. Several jurisdictions have adopted this approach. *See City of Sparks v. Armstrong,* 103 Nev. 619, 748 P.2d 7 (1987); *Nadler v. City of Mason City,* 387 N.W.2d 587 (Iowa 1986); *Lincoln Loan Co. v. State,* 274 Or. 49, 545 P.2d 105 (1976); *Klopping v. City of Whittier,* 8 Cal.3d 39, 104 Cal.Rptr. 1, 500 P.2d 1345 (1972); *In re Elmwood Park Project,* 376 Mich. 311, 136 N.W.2d 896 (1965).[4]

We decline to adopt this rule. The necessary review time between public announcement and acquisition of property for a particular project will depend on many factors unique to the project, including the projected cost, the number of feasible alternatives, the potential environmental impact, and the extent of federal involvement. Competing interests must be considered: on the one hand, the interest of the landowner in not having the cloud of condemnation hanging over his property, and on the other, the need for thorough public debate, environmental review, and consideration of project alternatives. If the government were subject to liability for "unreasonable" delay, however, its consideration of these competing interests would be skewed. Officials would be pressured to expedite property acquisition to avoid immediate liability to a particular landowner, regardless of the long-term social costs. Public policy dictates that the government be free to make this type of planning decision in the public interest, without threat of civil liability to a particular landowner. In the absence of clear constitutional or statutory authority, we decline to recognize a liability rule that would so skew governmental decision-making.

This same rationale has traditionally been applied to other types of highway planning decisions. Such decisions as whether to build a road or where it should be located do not give rise to liability under art. I, § 17, even though the action may significantly affect the market value of property. *See State v. Wood Oil,* 751 S.W.2d 863 (Tex.1988) (damage to business caused by traffic being required to travel a more circuitous route to reach property is not compensable). Clearly, construction of highways and other public projects would be significantly impeded if the government had to defend such planning decisions in court under a "reasonableness" standard.

Westgate's legal theory in the trial court and on appeal has been that the government acted unreasonably, not that the government acted in bad faith in delaying the condemnation proceedings. The policy reasons that support our decision today might not be applicable where the condemning authority is accused of intentionally injuring a landowner. *Cf. Hood,* 615 S.W.2d at 358 (court cited absence of bad faith in concluding that threat of condemnation did not give rise to compensable claim); *Orfield,* 232 N.W.2d at 927 (no taking where condemning authority did not legally restrain use of the property and did not act in bad faith in its dealings with the landowner). As the issue is not before us, however, we do not now address whether a landowner may state a cause of action for inverse condemnation where the condemning authority acts in bad faith to cause economic damage to the landowner.

---

4. In Alaska, pre-condemnation publicity which impairs the marketability of property constitutes an "imputed taking" even without a showing of unreasonable delay. *See Ehrlander v. State,* 797 P.2d 629 (Alaska 1990). Other jurisdictions impose liability only where the pre-condemnation publicity in effect renders the property worthless. *See Washington Market Enterprises, Inc. v. City of Trenton,* 68 N.J. 107, 343 A.2d 408 (1975); *Conroy-Prugh Glass Co. v. Commonwealth,* 456 Pa. 384, 321 A.2d 598 (1974); *Horak v. State,* 171 Conn. 257, 368 A.2d 155 (1976). *Lange v. State,* 86 Wash.2d 585, 547 P.2d 282 (1976) (en banc) has been cited by amicus curiae in support of Westgate's position. *Lange,* however, merely holds that property should be valued in a statutory condemnation proceeding without regard to devaluation caused by the government's pre-condemnation activities. We have previously recognized this rule, *see City of Fort Worth v. Corbin,* 504 S.W.2d 828 (Tex.1974), and the trial court below instructed the jury accordingly.

## C

■ The dissent argues that Westgate did assert a bad-faith claim. At 461. Although Westgate may have pleaded such a claim, it requested jury issues only as to *unreasonable* delay and *negligent* failure to warn, not bad faith. It is a party's request for jury issues and instructions, not its pleadings, that determine whether a cause of action is preserved. Tex.R.Civ.P. 279.

■ The dissent further argues that even if Westgate did not assert a bad-faith claim, we should remand for a new trial to allow it to do so. Although we have discretion to remand for a new trial in the interest of justice, Tex.R.App.P. 180, we decline to exercise that discretion under the circumstances of this case.

The most compelling case for such a remand is where we overrule existing precedents on which the losing party relied at trial. *See Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826 (Tex.1990); *Casso v. Brand*, 776 S.W.2d 551 (Tex.1989) (Phillips, C.J., dissenting); *Scott v. Liebman*, 404 S.W.2d 288 (Tex.1966). That is not the case here. We are not today overturning any Texas precedent that would have allowed Westgate to recover by showing negligent failure to warn or unreasonable delay.

We have also remanded in the interest of justice where it appears from the record that the losing party might be able to recover under some other established legal theory that was not developed at the first trial. *See, e.g., Morrow v. Shotwell*, 477 S.W.2d 538 (Tex.1972); *American Title Insurance Co. v. Byrd*, 384 S.W.2d 683 (Tex.

1964); *Southampton Civic Club v. Couch*, 159 Tex. 464, 322 S.W.2d 516 (1958); *Hicks v. Matthews*, 153 Tex. 177, 266 S.W.2d 846 (1954); *Dahlberg v. Holden*, 150 Tex. 179, 238 S.W.2d 699 (1951). Again, that is not the case here. No existing Texas precedent allows Westgate to recover for bad-faith delay, and we do not today recognize such a cause of action.

Additionally, we have remanded in the interest of justice where we announce a new standard of recovery in the case under consideration. *See Caller–Times Publishing Co. v. Triad Communications, Inc.*, 826 S.W.2d 576 (Tex.1992); *City of San Antonio v. Pigeonhole Parking of Texas, Inc.*, 158 Tex. 318, 311 S.W.2d 218 (1958). Here, Westgate has proceeded throughout on a negligence or "unreasonableness" theory. Even though its pleadings suggest that it initially may have contemplated proving bad faith,[5] Westgate never argued to any court for a higher standard, nor did the government.[6] We do not think it is "in the interest of justice" to decide a legal question that has been neither briefed nor argued by the parties, and we do not read Tex.R.App.P. 180 as compelling us to do so.

We have located no other case where this Court ordered a remand to allow the losing party to pursue a legal theory not recognized under Texas law. Indeed, such a remand would not be in the interest of justice, as it would subject the prevailing party to a second trial on an uncertain legal theory. As we do not today recognize an alternative legal theory that might support a judgment on remand for Westgate, we decline to remand in the interest of justice.

---

**5.** Westgate claimed in its Answer and Cross–Action that:

> The Condemnees told the City and State on numerous occasions that the threatened condemnation was destroying their ability to lease their shopping center to prospective tenants. *In spite of this knowledge,* the Condemnors continued to fail and refuse to condemn the premises, to compensate the Condemnees, or to otherwise act to mitigate Condemnee's losses.... This [conduct] was undertaken by the Condemnors *deliberately and with full knowledge of the injuries being inflicted on these Cross–Plaintiffs and in conscious and*

> *contemptuous disregard for the rights and interests of these litigants.* (emphasis added).

**6.** Westgate could have requested jury instructions on bad faith and negligence. Although we adhere to the principles of broad-form submission, *see Texas Department of Human Services v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990), Tex. R.Civ.P. 277 is not absolute; it mandates broad-form submission "whenever feasible." Submitting alternative liability standards when the governing law is unsettled might very well be a situation where broad-form submission is not feasible.

**D**

■ Westgate also argued in the trial court, and the jury found, that the government was negligent in failing to warn Westgate of the highway project before Westgate constructed the shopping center. It is not clear from Westgate's briefing and oral argument whether it contends that the failure to warn constituted a taking under art. I, § 17 independent of the government's delay in effecting the condemnation. In any event, we conclude that the failure to warn, absent any showing of bad faith, was not a taking or damaging of property, since it resulted in no restriction on the property's use. We note, however, that Westgate did recover the value of the improvements as part of its damages in the subsequent statutory condemnation proceeding.

We accordingly hold that Westgate's property was not taken or damaged within the meaning of Tex. Const. art. I, § 17 prior to January 5, 1989.

**III**

The trial court submitted two separate questions to the jury on the statutory condemnation claim, one asking the value of Westgate's entire tract without considering the highway project, and the other asking the value of Westgate's remaining portion not taken by the government. The court of appeals, citing our opinion in *Callejo v. Brazos Electric Power Cooperative, Inc.,* 755 S.W.2d 73 (Tex.1988), concluded that only one question should have been submitted asking the difference in these two values. We conclude that the court of appeals correctly disposed of this issue under *Callejo.* However, because of the confusion as to the proper measure of compensation in a partial-takings case, we believe further discussion of this subject is appropriate.

■ This Court has long held that the measure of compensation in a partial-takings case is the market value of the part taken plus damage to the remainder caused by the condemnation. *Buffalo Bayou, Brazos and Colorado Railway Co. v. Fer-*

ris, 26 Tex. 588, 603–04 (1863). *Ferris* makes clear that the landowner is in all cases entitled to at least the market value of the part taken, even if the condemnation actually increases the value of the remainder.

In *State v. Carpenter,* 126 Tex. 604, 89 S.W.2d 194 (1936), we reiterated this holding by suggesting three special issues to be submitted in partial-takings cases. These issues ask the jury to determine: (1) the market value of the part taken, "considered as severed land"; (2) the market value of the remaining tract of land, exclusive of the part taken, immediately before the taking; and (3) the market value of the remaining tract of land immediately after the taking. *Id.* 89 S.W.2d at 201–02.

After *Carpenter,* we repeatedly reaffirmed the use of the "market value of the part taken plus damages to the remainder" measure of compensation and *Carpenter*'s corresponding special issues. *See, e.g., City of Pearland v. Alexander,* 483 S.W.2d 244, 247 (Tex.1972); *State v. Walker,* 441 S.W.2d 168, 175 (Tex.1969); *State v. Meyer,* 403 S.W.2d 366, 371 (Tex.1966); *City of Austin v. Cannizzo,* 153 Tex. 324, 329–30, 267 S.W.2d 808, 812 (1954). In *Uselton v. State,* 499 S.W.2d 92 (Tex.1973), however, we recognized that the *Carpenter* questions may not be appropriate where the part taken is a small or irregularly shaped tract that is difficult to value as severed land. We approved the following questions in *Uselton:* 1) the market value of the part taken, considered as severed land; 2) the market value of the entire tract before the taking; and 3) the market value of the remainder after the taking, giving consideration to the uses to which the condemned part is to be subjected. *Id.* at 95 n. 1. Under this approach, the total measure of damages is usually the difference between questions 2 and 3; however, if this difference is less than the answer to question 1 (indicating that the condemnation increased the value of the remainder), the landowner is entitled to the market value of the part taken.[7] The *Uselton* approach is prefera-

---

7. The trial court in *Uselton* actually determined    damages as follows: it first subtracted the ques-

ble where the part taken is small or irregularly shaped because it focuses on the difference between larger, more easily valued tracts. The jury is still asked to determine the market value of the part taken, but this amount will be significant under the *Uselton* approach only where the condemnation *increases* the value of the remainder. It is only in those cases that the total diminution in value of the landowner's property will be less than the value of the part taken. If there is no evidence of such an increase, the first *Uselton* question would generally not need to be submitted.

We again emphasize that the *Uselton* approach is an appropriate alternative for measuring damages in a partial-takings case. It is preferable when the part taken does not constitute a separate economic unit, but it is by no means limited to those cases. The trial court has discretion to determine whether the *Carpenter* or *Uselton* approach should be used, given the circumstances of the particular case.

■ The specific questions approved in *Carpenter* and *Uselton*, however, are no longer appropriate under the requirement of broad-form submission. *See* Tex. R.Civ.P. 277; *Callejo*, 755 S.W.2d at 76. Rather than asking separate questions concerning the before and after value, trial courts should submit one question asking the difference in these values. Thus, the three *Carpenter* questions should be reduced to two questions: first, the market value of the part taken, considered as severed land, and second, damages to the remainder, accompanied by an instruction that such damages should be determined by considering the difference between the remainder's pre- and post-taking value.

The three *Uselton* questions should similarly be reduced to two questions: first, the market value of the part taken, considered as severed land, and second, the damages to the landowner's property, accompanied by an instruction that such damages should be determined by considering the difference between a) the value of the landowner's entire tract before the taking, and b) the market value of the remainder after the taking, giving consideration to the uses to which the condemned part is to be subjected.

The issues submitted by the trial court in this case correspond to the second and third *Uselton* questions. The first *Uselton* question was not necessary, and Westgate did not request it, as there was no evidence that the condemnation increased the value of Westgate's remaining property. The trial court thus submitted the proper *measure* of damages; however, as discussed, the damages should have been submitted broadly as one question asking the difference in the pre- and post-taking value, rather than two separate questions.

■ In many cases, the failure of a trial court to submit questions in broad form will not be reversible error. *See, e.g., H.E. Butt Grocery Co. v. Warner*, 845 S.W.2d 258, 260 (Tex.1992). In the present case, however, the trial court's failure to submit in broad form produced a demonstrably different result than if a broad-form question had been used. The difference in the before and after values found by the jury was $2,524,000. This difference was within the permissible range of damages supported by the evidence, and would have stood as the damages if a broad-form question had been given. How-

---

tion 1 amount from the question 2 amount, to arrive at the pre-condemnation value of the part not taken; it then subtracted from this resulting value the question 3 amount, to arrive at an amount for the damage to the remainder caused by the condemnation; finally, it added back to this figure the question 1 amount, to arrive at total damages. Because the question 1 amount was first subtracted and then added back to the total, this procedure produces the same result as simply subtracting question 3 from question 2.

The trial court in Uselton also asked the following additional question:

Do you find from a preponderance of the evidence that the market value of the remainder of the defendants' tract of land not taken was decreased in market value as a result of the condemnation by the plaintiffs, giving consideration to the uses to which the part taken is to be subjected? Answer "yes" or "no." [Answer: Yes]

We have never required this type of threshold question inquiring whether the landowner suffered damages to the remainder, and such a question is not necessary.

ever, the trial court, examining the jury's before-taking and after-taking answers separately, determined that the before-taking value was $210,000 lower than the evidence would support, and accordingly increased the damages to $2,734,000. The trial court's failure to submit in broad form thus increased the damages on the statutory condemnation claim by $210,000, and constituted harmful error. *See* Tex. R.App.P. 184(b).

We accordingly affirm the judgment of the court of appeals on the statutory condemnation claim as well as the inverse condemnation claim. Proceedings on remand should be conducted in accordance with this opinion.

Dissenting Opinion on Motion for Rehearing by DOGGETT, J., joined by MAUZY, J.

Separate Dissenting Opinions by MAUZY, DOGGETT, and GAMMAGE, JJ., dated July 1, 1992 stand as delivered.

MAUZY, Justice, dissenting.■
July 1, 1992.

Many people talk about the clumsiness of governmental bureaucracies. Few, however, embrace it as warmly as the majority does today. Abandoning the standard of conduct traditionally applied in this and other jurisdictions, the majority gives its seal of approval to bureaucratic bungling that can cause millions of dollars in damages to Texas landowners. I dissent.

Article I, section 17 of the Texas Constitution guarantees that "[n]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made ..." Because of the words "damaged or destroyed," a landowner may be entitled to compensation even in the absence of a direct physical invasion of the property. *Du-Puy v. City of Waco*, 396 S.W.2d 103, 108 (Tex.1965). Acts short of physical invasion can amount to a compensable taking when

the government unreasonably interferes with access to property or otherwise imposes restrictions that constitute an unreasonable interference with the landowner's right to use and enjoy the property. *See Hubler v. City of Corpus Christi*, 564 S.W.2d 816, 820–21 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.), and cases cited therein. The issue in this case is whether the government's mishandling of a condemnation proceeding may constitute an unreasonable interference with the landowner's right to use and enjoy the property.

The condemnation process may, in some circumstances, require months or even years of deliberation. The government should not be expected to rush hastily through the acquisition of land; adequate time must be allowed for full, open consideration of all aspects of the taking, including concerns relating to the environment.

The government should, however, be expected to act reasonably. An unreasonable delay in the condemnation process unnecessarily prolongs the time during which the property's value is affected, potentially causing significant, unjustifiable injury to the landowner. In the present case, for example, the jury determined that the government's unreasonable delay cost Westgate $633,000 in lost profits.

Other jurisdictions would hold the government accountable for the harm caused by an unreasonable delay. *See, e.g., State ex rel. Morrison v. Helm*, 86 Ariz. 275, 345 P.2d 202, 207 (1959), *appeal dismissed*, 362 U.S. 609, 80 S.Ct. 960, 4 L.Ed.2d 1009 (1960); *Klopping v. Whittier*, 8 Cal.3d 39, 104 Cal.Rptr. 1, 11, 500 P.2d 1345, 1355 (1972); *Levine v. City of New Haven*, 30 Conn.Supp. 13, 294 A.2d 644, 645 (1972); *Roach v. Winnetka*, 366 Ill. 578, 10 N.E.2d 356, 359 (1937); *Nadler v. City of Mason City*, 387 N.W.2d 587 (Iowa 1986); *State v. Maynard*, 565 So.2d 532, 535–36 (La.App.), *rev'd. on other grounds*, 572 So.2d 39 (La. 1990); *Standard Indus., Inc. v. Depart-*

*ment of Transp.,* 183 Mich.App. 53, 454 N.W.2d 417, 419 (1990); *State ex rel. St. Louis v. Beck,* 333 Mo. 1118, 63 S.W.2d 814, 815 (1933); *City of Sparks v. Armstrong,* 103 Nev. 619, 748 P.2d 7, 8–9 (1987); *Durika v. School Dist. of Derry Township,* 415 Pa. 480, 203 A.2d 474, 475 (1964).

The majority, though, chooses to excuse the delay. Rejecting the approach that prevails elsewhere, the majority asserts that holding the government responsible for unreasonable delay would inhibit the consideration of competing interests. The reasonableness of a given delay, the majority implies, cannot be accurately determined by a jury of ordinary Texans. Allowing the jury to decide what is or is not reasonable "would so skew governmental decision-making," at 454, that the question of reasonableness should be left solely to the government itself.

I disagree. The citizens of Texas are fully capable of appreciating the need for public debate, environmental review, and consideration of alternatives. If those tasks actually require a four-year delay in completing the condemnation process, the jury should be trusted to find such a delay reasonable. Conversely, if those tasks do not actually require a four-year delay, a jury should be allowed to determine that the government has acted unreasonably. There is no justification for shielding the process from scrutiny; under our constitution, the government remains answerable to the public even when it condemns land.

Allowing Westgate to recover for the unreasonable delay in this case would be consistent with the approach taken in cases involving restrictions of access. *See City of Austin v. Avenue Corp.,* 704 S.W.2d 11, 13 (Tex.1986) (recovery permissible for temporary restriction that is negligently performed or unduly delayed). In either situation, the government's unreasonable delay constitutes an unreasonable interference

with the landowner's right to use and enjoy the property.

A showing of bad faith has never been required in access cases; nor should it be required in this case. As the dissenting opinion by Justice Doggett notes, "bad faith" means more than mere negligence; it implies "an intent to injure, or some other improper motive." at 461 (citing *King v. Swanson,* 291 S.W.2d 773, 775 (Tex.Civ.App.—Eastland 1956, no writ)). Thus, under a bad faith standard, the government may routinely and unreasonably delay condemnation proceedings, at landowners' expense, without fear of being held accountable.

The problem with bureaucracy is not that bureaucrats intend to injure the public. The problem is that the government becomes so absorbed in its own needs that it forgets those of the public. That problem would be addressed by an objective reasonableness standard; but it will not be addressed by a subjective bad faith standard.[1]

I would hold that the jury's finding of an unreasonable delay fully supports the inverse condemnation award. In addition, I agree fully with the views expressed in Parts II, III and IV of Justice Doggett's dissenting opinion, concerning the majority's failure to remand on the bad faith issue and its retreat from broad form submission. Therefore, I dissent.

DOGGETT, Justice, dissenting.

July 1, 1992

Governmental accountability is the true issue before us in this inverse condemnation case. Today's opinion implicitly acknowledges that this objective is furthered by openness in governmental decisionmaking and the availability of meaningful judicial remedies for abuse of governmental power. Yet the majority wrongfully deprives the business involved here[1] of any

---

1. Bad faith is, of course, a factor that may be weighed in determining whether a delay has been unreasonable. *See Nadler v. City of Mason City,* 387 N.W.2d at 587.

1. This insensitivity to the realities of independent business is but part of a growing trend

from a majority of this court. *See Holt Atherton Industries, Inc. v. Heine,* 835 S.W.2d 80, 86 (Tex. 1992) (Doggett, J., concurring and dissenting) (majority denied recovery of lost profits to a family business); *Caller-Times Publishing Co. v. Triad Communications, Inc.,* 826 S.W.2d 576,

chance to hold these particular bureaucracies responsible for their alleged bad faith. This business is left with no remedy for what may have been an improper delay.[2]

· I write today because of concerns about the majority's willingness to: (1) condone the potential abuse of an independent business by government; (2) embrace a new standard for remand which contradicts that announced within the last six months; and (3) reject our commitment to broad form submission of jury issues.

## I.

I agree that "sound public policy" demands that automatic liability not be imposed on a governmental entity that simply announces future plans for a public project that requires later acquisition of the property in question. at 453. A contrary rule would only motivate governmental secrecy, since the condemning agency would be advantaged by keeping silent its future plans. By avoiding such encouragement, even this majority must accept the court's unanimous preference for "openness at every stage of [governmental] deliberations." *Acker v. Texas Water Com'n,* 790 S.W.2d 299, 300 (Tex.1990).

I also agree that a rule imposing liability solely on the basis of "unreasonable" delay could result in hurried decisionmaking without allowing sufficient time for necessary public debate regarding the social, economic and environmental costs and benefits of a particular public project. at 454. By allowing the condemning authority to proceed cautiously, we both encourage thoughtful consideration and ensure a genuine opportunity for public input in the

process. *See Acker,* 790 S.W.2d at 300 (the public is "entitled to more than a result. They are entitled not only to know what government decides but to observe how and why every decision is reached.").

While not supported solely by a showing of delay, an inverse condemnation claim should be permitted "where the condemning authority is accused of intentionally injuring a landowner." at 454. This approach is consistent with the general rule that there must be "good faith on the part of the condemnor" to avoid liability. 27 Am.Jur.2d § 461, at 381 (1966). With an action available for governmental "bad faith in delaying the condemnation proceedings," at 454, claimants who demonstrate a condemning authority's improper intent should be able to recover for inverse condemnation actions. As I have previously written on behalf of this court:

> Businesses ensnarled in ... bureaucratic traps cannot provide the productive force so vital to our state's prosperity.... [P]ointless delays stifle the ... flame of initiative.... We must not have the type of cumbersome government that an earlier generation described as leaving its citizens "[s]kewered through and through with officepens, and bound hand and foot with red tape."

*Texas–New Mexico Power Co. v. Texas Indus. Energy Consumers,* 806 S.W.2d 230, 232 (Tex.1991) (quoting Charles Dickens, *David Copperfield* 606 (Dodd, Mead & Co. ed. 1936)). Allowance of bad faith claims properly holds the bureaucracy responsible for its actions without inhibiting public debate and open proceedings.

---

580 n. 4 (Tex.1992) (Doggett, J., dissenting) (discussing the court's overturning recovery by a small company put out of business by the anticompetitive practices of a monopoly); *Crim Truck & Tractor Co. v. Navistar Int'l Trans. Corp.,* 823 S.W.2d 591, 597 (Tex.1992) (Mauzy, J., dissenting) (criticizing the denial of a remedy for a local dealer for abuse by a franchisor).

**2.** The indifference to the condemner's extensive delay reflected in today's opinion is not surprising, considering the delay which has become endemic in the majority's own endeavors. *See Greathouse v. Charter Nat'l Bank–Southwest,* 1992 WL 379408 (Tex.1992) (Doggett, J., concur-

ring) (noting that the majority's "unnecessary delay" in deciding a case "inject[ed] prolonged uncertainty into commercial litigation, with resulting unfairness to businesses"); *Delaney v. University of Houston,* 835 S.W.2d 56, 61 (Tex. 1992) (Doggett, J., concurring) (discussing the great length of time a rape victim was forced to wait for a misleading opinion); *Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489, 538 (Tex.1992) (Doggett, J., dissenting) (deploring failure to release opinion requiring taxpayers to pay unconstitutional property taxes until after taxes were due).

"Bad faith" means more than negligence or lack of diligence. *Citizens Bridge Co. v. Guerra*, 152 Tex. 361, 258 S.W.2d 64, 69 (1953). It implies an intent to injure, or some other improper motive. *See King v. Swanson*, 291 S.W.2d 773, 775 (Tex.Civ. App.—Eastland 1956, no writ). Mere bad judgment does not qualify as bad faith. Rather, a claimant must show a knowing "disregard" of their rights. *Guerra*, 258 S.W.2d at 69. There is no public benefit in allowing a governmental entity to act with such indifference. As aptly stated by one amicus, "misuse of the condemnation process can cause catastrophic personal losses that are neither compensated nor similarly borne by other members of the community." [3]

## II.

Where I sharply diverge from the reasoning of the majority, however, is in its conclusion that "Westgate's legal theory in the trial court and on appeal [is] that the government acted unreasonably, not that the government acted in bad faith...." *Id.* The record simply does not support this conclusion. Westgate specifically claimed in its Answer and Cross–Action that:

> The Condemnees told the City and State on numerous occasions that the threatened condemnation was destroying their ability to lease their shopping center to prospective tenants. *In spite of this knowledge,* the Condemnors continued to fail and refuse to condemn the premises, to compensate the Condemnees, or to otherwise act to mitigate Condemnee's losses.... This [conduct] was undertaken by the Condemnors *deliberately and with full knowledge of the injuries being inflicted on these Cross–Plaintiffs and in conscious and contemptuous disregard for the rights and interests of these litigants.*

(emphasis added). This certainly appears from the face of the pleading to be a claim of bad faith in the sense of deliberately "disregarding" Westgate's rights. Even if doubt remains, we will generally construe the petition "as favorably as possible for the pleader." *Gulf, Colorado & Santa Fe Ry. Co. v. Bliss,* 368 S.W.2d 594, 599 (Tex. 1963). Furthermore, "[t]he court will look to the pleader's intendment ... even if some element of a cause of action has not been specifically alleged." *Id.*

After pleading what reasonably appears to be bad faith, Westgate introduced supportive evidence of this claim. The condemning authority approved Westgate's expedited application for hardship in November 1986, agreeing to purchase the property on an "early basis," yet did not commence legal proceedings until almost two years later. This delay occurred despite action initiated as early as April 1986 to resolve the acquisition of a nearby shopping center for the same highway project. Additionally, Westgate offered evidence that it was unable to sell or modify its property during the considerable time in question, indicating that a true injury may have been suffered.

The majority thus errs in concluding that there was no bad faith action brought here. Where the record could support a claim, here for bad faith, this court has usually remanded in the interest of justice when a party failed to offer probative evidence on a critical fact, and when the record had apparently not been fully developed. *See Texas Real Estate Com'n v. Nagle,* 767 S.W.2d 691, 695 (Tex.1989); *Aetna Ins. Co. v. Klein,* 160 Tex. 61, 325 S.W.2d 376, 379 (1959); *Sanford Ind. School Dist. v. Sanford,* 159 Tex. 155, 317 S.W.2d 188, 189 (1958); *Dahlberg v. Holden,* 150 Tex. 179, 238 S.W.2d 699, 704 (1951).

Even if no bad faith action had been brought, however, the majority's own reasoning still compels a remand in the interest of justice. *See* Tex.R.App.P. 180. Had Westgate proceeded on an incorrect legal theory of "unreasonable" delay, as the majority contends, we have in the past remanded in the interest of justice when a party simply proceeds under the wrong legal theory. *See, e.g., Morrow v. Shotwell,* 477 S.W.2d 538, 541–42 (Tex.1972) (remanding to allow a purchaser to make an argu-

**3.** Brief of Amicus Curiae Jim Ray at 5.

ment not advanced at the first trial); *Davis v. Gale,* 160 Tex. 309, 330 S.W.2d 610, 613 (1960) ("This court has often remanded a cause to give parties an opportunity to supply additional evidence and to amend pleadings."); *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 799 (1951); *United Gas Corp. v. Shepherd Laundries Co., Inc.,* 144 Tex. 164, 189 S.W.2d 485, 492 (1945) ("since the cause has been tried upon an erroneous theory we think justice will best be served by remanding the cause").[4]

Particularly persuasive in support of a remand is *City of San Antonio v. Pigeonhole Parking of Texas, Inc.,* 158 Tex. 318, 311 S.W.2d 218 (1958), in which a parking-garage owner sought relief against a city that denied a permit to build a driveway across the sidewalk, asserting an absolute right of street access. This court held that the City's police power authorized denial of street access if such denial was not "oppressive or arbitrary." *Id.* 311 S.W.2d at 223. We remanded to the trial court to give the landowner an opportunity to present any evidence of such oppression or arbitrariness, even though it had not advanced this argument or presented relevant evidence. *Id.* 311 S.W.2d at 223–24. Today the majority similarly announces that an inverse condemnation recovery will not be allowed absent bad faith, but then unfairly refuses to allow Westgate any opportunity to present evidence of bad faith on remand.[5]

### III.

The majority attempts to justify its refusal to remand not by reliance on any existing law, but rather by rejection of precedent and creation of a new quasi-standard requiring a party to have pled, proven, and requested a jury issue on a specific alternate legal theory to warrant a remand. at 455. The majority then apparently concludes that no such alternate legal theory exists. An alternate theory is present here, however, for the majority explicitly leaves open the possibility of bringing a cause of action based on bad faith. Because the potential of bringing such a cause of action remains, Westgate should be allowed to do so.[6]

This new pseudo-standard, offered with no supporting citations and little explanation, is remarkable both for its logical inconsistency and its total rejection of recent precedent. The majority concludes that by proceeding solely on a negligence theory, Westgate has essentially waived its right to a remand on a bad faith theory. This is despite the fact that neither this nor any other Texas court had even suggested a bad faith standard in any context relating to inverse condemnation. Furthermore, Westgate did not just submit an issue on negligence, as claimed by the majority, but instead submitted separate issues on negligence and on unreasonableness, both of which went to the jury. These submissions encompassed all existing legal standards in the area of inverse condemnation. The majority, rejecting all of Westgate's efforts, now requires impressive prescience on the part of litigants, who apparently must request jury issues not only on existing

---

**4.** Indeed, in neither the above cases nor any other precedent that has remanded in the interest of justice has there ever before been a need for adoption of a restrictive test of the sort utilized by the majority today. *See, e.g., Scott v. Liebman,* 404 S.W.2d 288, 294 (Tex.1966); *Popperman v. Rest Haven Cemetery, Inc.,* 162 Tex. 255, 345 S.W.2d 715, 718 (1961).

**5.** While instructive, *Pigeonhole* is not controlling on the issue of delay, since it admittedly involved inverse condemnation through restriction of access. This court has before recognized that in access cases, recovery will be allowed where the condemning authority acted illegally, with undue delay, *or negligently. City of Austin v. Agenue Corp.,* 704 S.W.2d 11, 13 (Tex.1986)

(emphasis added). The negligence part of this standard, similar to the unreasonableness approach, is appropriately rejected by the majority in a straightforward delay or intent-to-condemn case such as that involved here. The majority fails, however, to note this distinction even while applying the different standard. *See* at 454 (citing *State v. Wood Oil,* 751 S.W.2d 863 (Tex.1988)).

**6.** The majority claims that it has before remanded to allow a party to "recover under some other *established* legal theory that was not developed at the first trial." at 455 (emphasis added). None of the case law cited, however, suggests that the alternative legal theory be firmly "established."

causes of action, but also on any other standard or cause of action that this court may recognize at some future date or even that may someday exist in other jurisdictions.

But for its result, today's opinion is remarkably reminiscent of that in *Caller–Times Publishing Co., Inc. v. Triad Communications, Inc.*, 826 S.W.2d 576 (Tex. 1992) (opinion on motion for rehearing). In the original opinion there, the majority developed a new test designed to limit the previously existing prohibition on predatory pricing under the Texas Free Enterprise and Antitrust Act of 1983. Tex.Bus. & Com.Code §§ 15.01–15.51. Initially, like today, the majority failed to remand the case. *See* 826 S.W.2d at 589 (Doggett, J., dissenting). Then, on motion for rehearing, the court substituted a new opinion belatedly correcting this mistake and remanding for further proceedings in the interest of justice. The majority explicitly stated in this case "of first impression," 826 S.W.2d at 578, that "Texas antitrust law is sufficiently unsettled that *we remand* for a new trial on the antitrust question." *Id.* at 589. In an utterly inconsistent statement, the court today in a case where we "ha[ve] not previously addressed th[e] issue," at 452, rules that in circumstances where "the law of this state is unsettled and the rule in other jurisdictions is not uniform," the court will "*decline* to remand." at 455. It appears that at the ripe old age of six months, *Caller–Times* has already been added to the majority's rapidly expanding collection of abandoned precedent.

### IV.

Tucked into a footnote is the majority's very significant challenge to broad form submission. Today's opinion suggests that Westgate should have submitted a specific jury issue on bad faith. at 455 n. 5. To avoid inadvertent omissions of issues that

result in unnecessary reversals and thwart the jury's resolution of a case, the Texas Rules of Civil Procedure mandate broad-form submission of jury issues whenever feasible. Tex.R.Civ.P. 277. *See* Matt Rubin, *The Scope of Special Issues in Negligence Cases: Pleadings, Proof, and Rule 277*, 15 Hous.L.Rev. 735, 737 (1978); *Biggs v. First Nat'l Bank of Lubbock*, 808 S.W.2d 232 (Tex.App.1991); *see also Lemos v. Montez*, 680 S.W.2d 798, 801 (Tex.1984). Before today, we have consistently embraced this rule to encourage such submissions. *See Texas Dep't of Hum. Serv. v. E.B.*, 802 S.W.2d 647 (Tex.1990); *see also Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 924 (Tex.1981). Now the majority merely pays lip-service to such precedent, while clearly turning from it. As unanimously declared in *E.B.*, "[u]nless extraordinary circumstances exist, a court *must* submit such broad-form questions." 802 S.W.2d at 649 (emphasis added). Now the majority concludes that in the perfectly common instance of unsettled law or questions of first impression, a broad form instruction is no longer required. With no way of knowing that a bad faith standard would be adopted in this state, Westgate should not suffer from this burden. Such a rule lacks any persuasive logic, for broad form instructions should be most helpful precisely when the law is unsettled, since it is more difficult to frame particularized or limited jury issues in such circumstances.[7]

### V.

By denying a Texas business the opportunity to show it has been victimized by bureaucratic bad faith, the majority fails to follow the course taken in prior cases such as *Pigeonhole Parking*. As was the case in *Caller–Times*, it is my hope that the majority will admit and correct its error on motion for rehearing, as well as abandoning both its assault on broad form submis-

---

7. The majority's new rule regarding broad-form submission adopts the exact converse approach to Rule 277. An exception to broad-form submission is permitted under that rule not when the law is unsettled, but rather *only* when the existing case law *is well developed* or there is a contrary statutory mandate. *See* William W.

Kilgarlin, George (Tex.) Quesada & Robin Russell, *Practicing Law in the "New Age": The 1988 Amendments to the Texas Rules of Civil Procedure*, 19 Tex.Tech.L.Rev. 881, 914 (1988) (citing Transcript of Texas Supreme Court Advisory Committee Minutes, Sept. 12, 1986, Vol. I, at 116–18).

**464**

sion and its destructive new remand standard.

GAMMAGE, Justice, dissenting.

July 1, 1992

I agree with Justice Doggett that a bad faith standard in inverse condemnation claims based on delay will adequately balance the interests of property owners with the concerns of the public. I also am concerned that the majority has abandoned its recent precedent in *Caller–Times* in adopting a new, overly restrictive standard for remanding in the interest of justice. The rejection of broad-form jury submissions included in that test, at 455 n. 6, clearly violates the letter of TEX.R.CIV.P. 277 and this court's recent writing in *Texas Dep't of Hum. Servs. v. E.B.*, 802 S.W.2d 647 (Tex.1990). For these reasons, I dissent.

Rehearing Overruled, Dec. 2, 1992.

DISSENT ON MOTION
FOR REHEARING

Dec. 2, 1992.

DOGGETT, Justice.

In its further writing on rehearing, the majority has failed to address the most far-reaching of the misinterpretations reflected in its previous writing. One of these is the majority's turn away from broad form submission which has unfortunately become part of a broad scale abandonment of this principle. *See H.E.B. Grocery Co. v. Warner*, 845 S.W.2d 258, 260 (Tex.1992) (Mauzy, J., dissenting); *State Dept. of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex.1992) (Mauzy, J., dissenting); *Keetch v. Kroger Co.*, 845 S.W.2d 262, 268 (Tex.1992) (Mauzy, J., dissenting).

MAUZY, J., joins in this dissent on motion for rehearing.