**FIRST AMERICAN TITLE INSURANCE COMPANY, Appellant,**

v.

**John H. ADAMS, Jr., Joe E. Karne, Charles T. Malone, Lewis E. Dillon, Jean Polakoff, and Nancy Rae Kissman, Appellees.**

**No. 13–91–150–CV.**

Court of Appeals of Texas, Corpus Christi.

April 16, 1992.

Rehearing Overruled May 14, 1992.

Paul Gabriel, William M. Mills, Atlas & Hall, McAllen, for appellant.

Michael E. Hearn, Ruben R. Pena, Jones, Galligan, Key & Pena, Weslaco, for appellees.

Before NYE, C.J., and SEERDEN, J., and GERALD T. BISSETT[1], Assigned Justice.

## OPINION

NYE, Chief Justice.

This is an action for breach of contract involving title insurance policies. Appellees, John Adams, Jr., and other property owners, sued appellant, First American Title Insurance Company, an insurance underwriter. They alleged that a spoil disposal and right-of-way easement which the Arroyo Colorado Navigation District conveyed to the United States in 1947 was an encumbrance on their property and that First American did not except to this easement in their title policies. The case was presented to the jury on issues of breach of contract and damages. The jury found that the 1947 easement affected and was on appellees' property and awarded them $347,300 in damages. The trial court entered judgment for that amount. First American appeals by seven points of error, and appellees bring one cross-point of error. We reverse and render that appellees take nothing by their suit.

In 1931, the Texas Legislature[2] authorized the sale of 1,172 acres of certain submerged lands around the City of Port Isabel, Texas, for the purpose of building wharves, warehouses, and other improvements. This enabling legislation contained a metes and bounds description of the property. That same year, the State of Texas issued Patent 333. By this patent, the State conveyed to the City of Port Isabel the 1,172 acres of land described in the enabling legislation. Thereafter, the City of Port Isabel sold all of the land which it received out of Patent 333 to the Port Isabel Channel, Dock & Wharf Company (the Wharf Company). In 1934, a Cameron County district court entered a judgment, dividing the land which the City of Port Isabel received out of Patent 333. The City of Port Isabel obtained title to 346.04 acres of land, and the Wharf Company obtained title to the remaining acreage. In September, 1945, the Wharf Company issued a deed conveying all of its right, title and interest in and to all its land described in Patent 333 to the Port Isabel–San Benito Navigation District.

In October, 1945, the Port Isabel–San Benito Navigation District granted an easement (the 1945 easement) within Patent 333 to the United States for construction of the Intracoastal Waterway (Intracoastal) from Corpus Christi, Texas, to the Mexican Border. The 1945 easement gave the United States the perpetual right to: (1) remove all of the tract of land needed for the Intracoastal's construction and maintenance; (2) use any part of the tract of land for the deposit of dredge material; and (3) deposit water and material dug from the Intracoastal onto the Port Isabel–San Benito Navigation District's land, adjoining the tract of land upon which the easement was granted.

1. Assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to Tex. Gov't Code Ann. § 74.003 (Vernon 1988).

2. Act of April 27, 1931, ch. 132, § 1, 1930 Tex. Gen.Laws 251, 252.

In 1947, the Texas Legislature,[3] pursuant to Senate Bill No. 318, gave any navigation district, created under State law and composed of parts of one or more counties having one or more boundaries coincident with any part of the international border between the United States and Mexico (emphasis supplied):

> [T]he free and uninterrupted use, liberty and easement in and to all the rivers, streams, bayous, arroyos, resacas, lakes, lagoons, bays, arms of the sea, beds, banks, or shores thereof, mud flats or other lands covered or partly covered by the waters of any of the bays or other arms of the sea, and any other submerged land or lands *owned by the State of Texas* within the county or counties in which such district or districts are located and within the adjoining counties thereto, and along the route of any waterway, a part of which lies within such district, in order to connect such waterway with the Louisiana and Texas Intra-Coastal Canal Waterway now completed to Corpus Christi, Texas, for the purpose of navigation, conservation, reclamation, and flood control, in aid of navigation. *Provided, nevertheless, that nothing in this Act shall be construed to affect or impair any vested rights heretofore granted by the State of Texas in and to such lands and waters; provided, further, that nothing in this Act shall be construed to affect or impair private vested rights.*

Later that year, the Arroyo Colorado Navigation District, pursuant to Senate Bill No. 318, conveyed to the United States Army Corps of Engineers a "SPOIL DISPOSAL AND RIGHT-OF-WAY EASEMENT DEED" (the 1947 easement). The 1947 easement stated, in relevant part (emphasis supplied):

> WHEREAS ... [pursuant to Senate Bill No. 318] the free and uninterrupted use, liberty, and easement in and to all the rivers, streams, bayous, arroyos, resacas, lakes, lagoons, bays, arms of the sea, beds, banks, or shores thereof, mud flats or other lands covered or partly covered by the waters of any of the bays or other arms of the sea and any other submerged land or lands *owned by the State of Texas* within Cameron County, Willacy County, Kenedy County, Kleberg County, and Nueces County, Texas[,] was granted and conveyed to the said Arroyo Colorado Navigation District of Cameron and Willacy Counties, Texas. The said counties are either counties in which the said district is located, or adjoining counties thereto along the route of the Louisiana–Texas Intracoastal Waterway between Corpus Christi, Texas, and the Mexican Border. A part of said waterway is in said Arroyo Colorado Navigation District within Cameron and Willacy Counties, Texas....
>
> WHEREAS, the above rights, use and interest in said lands is desired by the United States of America to enable the Corps of Engineers of the United States Army to carry out the provisions of the said Acts of Congress in aid of navigation....

The 1947 easement covered two tracts of land. It described Tract 1 as a "strip of land nine hundred (900) feet wide, being four hundred and fifty (450) foot on each side of the center line of the Louisiana–Texas Intracoastal Waterway as it is to be surveyed and constructed in Corpus Christi Bay and Laguna Madre from a point on the corporate limits of the City of Corpus Christi, Texas, extending southerly through Nueces County, Kleberg County, Kenedy County, Willacy County, and Cameron County to a point near the mouth of the Rio Grande on the Mexican Border...." It described Tract 2 as a "strip of land five thousand (5,000) feet wide parallel and contiguous to the eastern boundary line of said Tract No. 1 and extending from the corporate limits of the City of Corpus Christi to the Mexican Border." This easement did not include a metes and bounds description of these land tracts.

The 1947 easement gave the Corps of Engineers the perpetual right to remove all of Tract 1 as needed for the Intracoastal's construction and maintenance, and to use

3. Act of May 2, 1947, ch. 163, § 1, 1947 Tex.Gen. & Spec.Laws 267.

any part of Tracts 1 and 2 for the deposit of dredge material and for such other purposes as needed in the Intracoastal's maintenance, together with the perpetual right and easement to flow water from spoil areas over Tracts 1 and 2.

In 1972, the United States Army Corps of Engineers quitclaimed to the Port Isabel–San Benito Navigation District all of its spoil-disposal rights in a tract of land located in Cameron County, Texas, containing 661.51 acres of land, more or less, out of Patents Nos. 6, 333 and 468, issued by the State of Texas in 1931. In January, 1985, the State of Texas conveyed a tract of land to Mark Freeland. This tract contained 670.25 acres out of the Patent 333. The instrument stated, in relevant part:

Insofar as this conveyance includes land heretofore patented by the State of Texas, it is the intent of the grantor to convey any remaining interest in the form of reversion, reverter or future right that grantor may have retained in the patent or by law and *it is not the intent of the grantor to cloud or cancel any patent previously issued on any property described herein.*

In the early 1980s, Sun Harbor Condominiums were built on Long Island in Port Isabel, Cameron County, Texas. Long Island was made of dredge material from the Intracoastal's construction. Appellees bought condos at Sun Harbor, and they also bought title insurance policies in connection with their condo purchases. First American underwrote the insurance on their policies. First American excepted to the 1945 easement from appellees' title policies, but it did not except to the 1947 easement from the Arroyo Colorado Navigation District which purported to give to the Army Corps of Engineers a spoil disposal and right-of-way easement over the subject property.

In December, 1988, appellees sent First American a demand letter. They alleged that: (1) the 1947 easement, which existed over their property, was not listed as an exception in their title policies; (2) this easement would continue as a detriment to their property's market value; and (3) the

1972 quitclaim from the Corps of Engineers to the Port Isabel–San Benito Navigation District did not release all of the rights which the Arroyo Colorado Navigation District granted to the Corps of Engineers in the 1947 easement, such as the perpetual right to flow water from spoil areas over Tracts 1 and 2 and the right to use this property for other purposes needed in the Intracoastal's preservation and maintenance. First American investigated the state of title at the time surrounding the 1947 easement grant. It concluded that the 1947 easement had no affect on appellees' property because the Port Isabel–San Benito Navigation District owned that property at the time the Arroyo Colorado Navigation District, a stranger to the property, purportedly granted the 1947 easement. First American denied coverage on appellees' alleged title policy claim. This lawsuit followed.

By point two, First American complains that the trial court erred by submitting Special Question No. 1 because it was a question of law for the trial court. This question asked:

Do you find from a preponderance of the evidence that the 1947 easement affects and is on the property in question?

Answer "Yes" or "No".

We, the Jury answer: <u>Yes</u>

Appellees argue that First American did not properly object to the submission of this question. First American did object to the submission of this question, in relevant part as follows:

[W]e would object to Question No. 1 being submitted to the jury. Your Honor, our position is that no fact questions should be submitted to the jury regarding whether or not the 1947 easement affects and is on the property in question because same calls strictly for a legal conclusion which is without the purview of the jury.

▬ Rule 274 of the Texas Rules of Civil Procedure provides that "[a] party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection." The purpose of this rule is to afford trial courts an oppor-

tunity to correct errors in the charge by requiring objections both to clearly designate the error and to explain the grounds for complaint. *Wilgus v. Bond,* 730 S.W.2d 670, 672 (Tex.1987); *Castleberry v. Branscum,* 721 S.W.2d 270, 276 (Tex.1986). An objection that does not meet both requirements is properly overruled and does not preserve error on appeal. In this case, First American's objection stated that whether the 1947 easement affected the property should not be submitted to the jury because the question called for a legal conclusion. The objection preserved error for appeal.

Appellees and appellant First American do not dispute that Sun Harbor was built on the land which the State had conveyed to the City of Port Isabel in Patent 333. However, the parties disagree whether the 1947 easement affects and is on appellees' property. Appellees rely on the testimony of Tom Stovall and Glenn McGehee to support their contention that the 1947 easement affects and is on their property. Appellees' expert witness, Tom Stovall, testified that he has been a registered surveyor in Texas since 1969 and that he has performed nearly 7,800 surveys. He does not have any legal training, nor does he have any training or expertise in the area of land titles. He testified, however, that the 1947 easement covered Sun Harbor Condominium sites and that it conveyed rights over State-owned lands. He opined that in 1947, the property upon which Sun Harbor now rests was State-owned land. This was based upon his interpretation of what the State of Texas conveyed to the City of Port Isabel in Patent 333. He also said that Sun Harbor was within Patent 333 and that Patent 333 did not convey ownership, but only an easement, in the 1,172 acres which the State conveyed to the City of Port Isabel.

Glenn McGehee, a licensed realtor, testified that he was of the opinion that Sun Harbor was built on a Corps of Engineers' easement. However, he admitted that he had never heard of the 1947 easement.

The testimony from Stovall and McGehee does not support the trial court's judgment

because their testimony was in error as a matter of law as we demonstrate hereafter.

The province of the trial judge is to construe and determine the legal effect of unambiguous written instruments. 1 R. RAY, TEXAS LAW OF EVIDENCE CIVIL AND CRIMINAL § 9 (Texas Practice 3d ed. 1980). In this case, the trial court did not make an initial determination that the 1947 easement was ambiguous. Instead, the trial court said, "I think we had some evidence to indicate that it [the 1947 easement] was to some extent [ambiguous]." The trial court submitted Special Question No. 1 to the jury over First American's objection. The trial court should have first looked at the 1947 easement and decided whether it affected or was on appellees' property.

In this case, the estate that was conveyed in Patent 333 determines whether the 1947 easement affects and is on appellees' property. The State of Texas has title to all submerged lands, of all bays, inlets, and other waters along the Gulf of Mexico, including the Laguna Madre. *Lorino v. Crawford Packing Co.,* 142 Tex. 51, 175 S.W.2d 410, 413 (1943); *City of Port Isabel v. Missouri Pac. R.R. Co.,* 729 S.W.2d 939, 943 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.). The State had the power, through our Legislature, to convey title to the submerged lands in the Laguna Madre. *Lorino,* 175 S.W.2d at 414; *City of Port Isabel,* 729 S.W.2d at 943.

A patent regular on its face confers legal title to the patentee, and it is evident that the State parted with its title to the land, and the transfer of it to the patentee. *See Hennessy v. Blair,* 107 Tex. 39, 173 S.W. 871, 873 (1915); *Stephens v. Geiser,* 71 Tex. 140, 8 S.W. 610, 611 (1888); 3 F. Lange & A. Leopold, LAND TITLES AND TITLE EXAMINATION, § 151 (Texas Practice 2d ed. 1992). A fundamental tenet of property law is that the validity of a State land grant is based on the Land Commissioner's authority to issue the patent. *State v. Delesdenier,* 7 Tex. 76, 79 (Tex. 1851); *State v. Aransas Dock & Channel Co.,* 365 S.W.2d 220, 222 (Tex.Civ.App.—San Antonio 1963, writ ref'd). Courts must examine the enabling legislation to determine the

exact estate which the Legislature gave the Land Commissioner the authority to convey. *Aransas Dock & Channel Co.*, 365 S.W.2d at 222. Courts look to all parts of the enabling legislation to ascertain its proper construction and meaning, and thereby determine the legislative intent. The legislative intent is the law. When the Legislative intent was to permit the conveyance of fee simple title to submerged land, then we must look to the action of the State officials to see that they carried it out. *Texas Parks & Wildlife Dept. v. Champlin Petroleum Co.*, 616 S.W.2d 668, 672 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.). In applying this rule, courts will not look alone to one phrase, clause, or sentence of the enabling legislation, but to the entire legislation; and this includes the caption, the body, and the emergency clause. *Trawalter v. Schaefer*, 142 Tex. 521, 179 S.W.2d 765, 767 (1944); *Aransas Dock & Channel Co.*, 365 S.W.2d at 222.

Following these guidelines and in examining the 1931 enabling legislation in this light (the legislation which authorized conveyance of the land in Patent 333), it is clear that the title and caption specifically authorized the sale of submerged land to the City of Port Isabel (City). There is absolutely nothing in the title or caption mentioned or even intimated that the sale should have been limited to an easement.

 The body of the Act stated that in January, 1829, the Republic of Mexico granted Rafael Garcia the Santa Isabel lands. These lands were located on the Laguna Madre shores and became part of the City. In February, 1852, the State of Texas confirmed the grant of the Santa Isabel lands to Rafael Garcia. Since that time, the shoreline of the Santa Isabel lands on which the City was located had changed, so that what parts of the submerged and partially submerged lands then in the Laguna Madre passed by the confirmation to Rafael Garcia, and what parts remained State property as submerged lands under the Laguna Madre, could not be determined. The City had acquired the title derived through Rafael Garcia to the submerged and partially submerged land, and it wanted to create wharves, warehouses, and other improvements along the Laguna Madre. But due to the uncertainty of its title, the City was not able to proceed "without an Act of the Legislature clearing its title to the submerged and partially submerged land necessary for such purposes."

Section 1 of the Act authorized the Land Commissioner to sell the City "all that certain tract or parcel of land, now lying submerged, or partially submerged under the waters of Laguna Madre...." This section gave the metes and bounds description and stated that the tract contained 1,172 acres. Nothing in § 1 stated that the land sale should have been limited to an easement. Section 3 of the Act stated, in relevant part, that once the City paid for the land, a patent would issue, granting the land to the City. This section also stated that the patent would say that the land was granted:

> [F]or the purpose of promoting navigation of Coastal waters of Texas, and to enable said City of Port Isabel to build and construct or cause to be built and constructed a channel not less than twenty-five (25) feet in depth over, across, along, through and upon lands now covered by waters of Laguna Madre, for the navigation of seagoing and other vessels, and the construction and maintenance on such channel of warehouses, docks, piers, wharves, bulkheads and other facilities for loading and unloading vessels of all kinds, and for storing, holding and preserving all manner of shipments of goods; but reserving to the State all interest in all oil, gas, sulphur and minerals of any and all character with right of ingress and egress and all other rights and easements necessary to their recovery.

Section 3 (above) set forth various purposes for which the land could be used but did not seek to restrict the land to the above-mentioned purposes (except minerals).

Section 5, the emergency clause, stated that the development of channel, dock, and wharf facilities at Port Isabel was of great

public importance to Texas citizens and that this development could not proceed until the City had procured (emphasis supplied) *"a clear title to the submerged lands necessary for those purposes...."*

In a similar case, the San Antonio Court of Appeals examined enabling legislation similar to the enabling legislation in this case in *Aransas Dock & Channel Co.* In that case, five surveys were patented to the Aransas Pass Channel and Dock Company, pursuant to the provisions of §§ 4 and 6 of a legislative act (1911 Act). The State filed a trespass to try title suit, asserting that the 1911 Act did not authorize the sale of the mineral estate. The trial court held that Aransas Dock and Channel had fee simple title in the surface and mineral estate, and the State appealed. The appellate court noted that § 4 of the 1911 Act set forth various purposes for which the conveyed land could be used, although it did not seek to restrict its use to these purposes. Section 4 provided that any channel and dock company or city, buying lands under the 1911 Act, had the right to build thereon any docks, wharves, warehouses, elevators, coal chutes, terminal tracks, dry docks, slips or ship yards, and all appurtenances thereto, useful or necessary in the development of its property and proper conduct of its business, or in the development of a deep-water port. The appellate court, after fully examining the 1911 Act, said that the granting of an easement would not be consistent with this type of development.

In the case now before us, after examining the context of the 1931 enabling legislation and the nature of the conveyance, we hold that the legislative intent was to permit the conveyance of fee simple title to the land (except minerals) to the City of Port Isabel. *See Aransas Dock & Channel Co.,* 365 S.W.2d at 222.

The relevant portions of Patent 333 which conveyed the subject title in 1931 stated as follows (emphasis supplied):

I, ... Governor of the State ... do by these presents grant to THE CITY OF PORT ISABEL, its assigns forever, ... (1172) acres of land situated and de-

scribed as follows: In Cameron County, known as survey 667, situated about 21 miles N. 55 E[.] from the county site, said land having been surveyed by virtue of ... [the 1931 enabling legislation] and for the purpose of promoting navigation of coastal waters of Texas, and to enable said City of Port Isabel to build and construct or cause to be built and constructed a channel of not less than twenty-five (25) feet in depth over, across, along, through and upon lands now covered by waters of Laguna Madre, for the navigation of seagoing and other vessels, and the construction and maintenance on such channel of warehouses, docks, piers, wharves, bulk heads and other facilities for loading and unloading vessels of all kinds, and for storing, holding and preserving all manner of shipments of goods; but reserving to the State all interest in all oil[,] gas, sulphur and minerals of any and all character, with right of ingress and egress and all other rights and easements necessary to their recovery.... Hereby relinquishing to it the said The City of Port Isabel and its assigns forever, all the right and title in and to said land *heretofore held and possessed by the said State....*

It is clear to us that by virtue of Patent 333 issued in 1931, the City of Port Isabel owned a fee simple title (except minerals) to the lands which the State conveyed to the City of Port Isabel and its assignees forever. *See Aransas Dock and Channel Co.,* 365 S.W.2d at 222; *see also Texas Parks & Wildlife Dept.,* 616 S.W.2d at 672. Sun Harbor was built on lands which the State of Texas conveyed to the City of Port Isabel in Patent 333. This was admitted by the attorney for the appellees.

## THE 1947 EASEMENT

In 1947 the Texas Legislature gave a certain blanket-type easement to *any navigation district* created under State law having one or more boundaries coincident with any part of the international border between the U.S. and Mexico—for the purpose of navigation, conservation, reclamation, and flood control, in aid of Navigation.

Arroyo Colorado was just such a Navigation District as described in Senate Bill 318. Later in 1947, the Arroyo Colorado Navigation District gave a spoil disposal and right-of-way easement to the Army Corps of Engineers (the 1947 easement).

In 1947, when the Arroyo Colorado Navigation District (pursuant to Senate Bill No. 318) gave an easement to the United States Army Corps of Engineers, the State of Texas was not the owner of the Long Island where Sun Harbor built the subject condominiums, described in Senate Bill 318. Senate Bill 318 stated that the navigation districts were to receive the use, liberty, and easement in (emphasis supplied) "submerged land or lands *owned by the State of Texas* . . . ." The Bill went on to state that "nothing in this Act shall be construed to affect or impair any vested rights heretofore granted by the State of Texas in and to such lands and waters; provided, further, that nothing in this Act shall be construed to affect or impair private vested rights." Since Sun Harbor was built on land which the State had conveyed in 1931 to the City of Port Isabel in Patent 333, and the 1947 easement went only to land then owned by the State of Texas, the 1947 easement cannot and did not affect appellees' property. One may not convey more than one owns.

A trial court should not submit a special question asking the jury to answer a question of law. *Mobil Chem. Co. v. Bell*, 517 S.W.2d 245, 253 (Tex.1974); *Ergon, Inc. v. Dean*, 649 S.W.2d 772, 776 (Tex.App.—Austin 1983, no writ). Accordingly, the trial court erred in submitting Special Question No. 1 to the jury. This question should have been decided by the trial court in First American's favor as a matter of law.

In their brief, appellees point out that when First American's attorney signed the judgment entitled "AGREED AMENDED JUDGMENT NUNC PRO TUNC," the attorney signed under the notation, "APPROVED AS TO FORM AND SUBSTANCE." Appellees argue that First American's approval of the judgment means that it cannot appeal from the judgment because the judgment was entered by agreement and consent.

The general rule is that a party may not attack a judgment to which he has agreed, absent allegation and proof of fraud, collusion, or misrepresentation. *Bexar County Criminal Dist. Attorney's Office v. Mayo*, 773 S.W.2d 642, 644 (Tex. App.—San Antonio 1989, no writ); *Charalambous v. Jean LaFitte Corp.*, 652 S.W.2d 521, 525 (Tex.App.—El Paso 1983, writ ref'd n.r.e.). In this case, the question is whether a lawyer whose signature showed "APPROVED AS TO FORM AND SUBSTANCE" had agreed and consented to the judgment or approved the judgment only as to the form. A party who approves the form of the judgment does not give up the right to appeal. *Mayo*, 773 S.W.2d at 644. *See Sigma Sys. Corp. v. Electronic Data Sys. Corp.*, 467 S.W.2d 675, 677 (Tex. Civ.App.—Tyler 1971, no writ). We cannot agree that the phrase "APPROVED AS TO FORM AND SUBSTANCE," standing alone, shows a "consent judgment" and a voluntary relinquishment of the right to appeal. Nothing in the body of the judgment suggested that the case had been settled or that the judgment was rendered by consent. No other indications of agreement exist in the record. In order to have a consent judgment, a party must explicitly and unmistakably give consent. *Mayo*, 773 S.W.2d at 644; *Hill v. Bellville Gen. Hosp.*, 735 S.W.2d 675, 678 (Tex.App.—Houston [1st Dist.] 1987, no writ). The notation "APPROVED AS TO FORM AND SUBSTANCE," standing alone, is too indefinite to justify declaring as a matter of law that this judgment was a consent judgment. *See Mayo*, 773 S.W.2d at 644 (court said that to remove all uncertainty, better practice is to state "Approved as to Form and Substance"). Since First American did not agree to a consent judgment, it was entitled to bring this appeal.

Due to our disposition of point two, we need not address the remaining points. TEX.R.APP.P. 90(a).

The trial court's judgment is REVERSED, and judgment is here REN-

DERED that appellees take nothing by their suit.