James J. BYRNE, Appellant,

v.

HARRIS ADACOM NETWORK
SERVICES, INC. and Harris
Corporation, Appellees.

No. 06–98–00162–CV.

Court of Appeals of Texas,
Texarkana.

Submitted Nov. 15, 1999.

Decided Dec. 16, 1999.

Rehearing Overruled Jan. 11, 2000.

John C. Eichman, Jenkens & Gilchrist, Robert B. Gilbreath, Jenkins & Gilchrist, Knox, Joel R. Sharp, Jenkens & Gilchrist, P.C., Dallas, Damon Young, Law Offices of Damon Young, Texarkana, for appellant.

D. Ronald Reneker, Bush, Craddock & Reneker, LLP, Dallas, John R. Mercy, Atchley, Russell, Waldrop, Texarkana, for Harris Adacom Network.

Douglas James Buncher, Bush Craddock & Reneker, Dallas, for appellees.

Michael C. Steindorf, Ben Taylor, Brett C. Govett, Fulbright & Jaworski L.L.P., Dallas, for Harris Corporation.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## O P I N I O N

Opinion by Chief Justice CORNELIUS.

James J. Byrne appeals from a take-nothing judgment rendered in his suit against Harris Adacom Network Services (HANS) and Harris Corporation (Harris) for breach of written and oral contract, *quantum meruit,* and fraud. In four points of error, all of which allege error in the jury charge, Byrne contends that the trial court committed reversible error in the jury charge by conditioning one independent theory of recovery on another, and abused its discretion by including an improper instruction in the jury charge, submitting Byrne's fraud claim as a special issue rather than in broad form, in violation of Texas Rule of Civil Procedure 277, and improperly conditioning the broad-form fraud question on the special issue question. We overrule these points and affirm the judgment.

In 1990, Harris,[1] a manufacturer of electronic business products, sold its data communications business, Harris Data Communications, to Adacom Corporation (Adacom) in exchange for cash, stock, and promissory notes (the Adacom acquisition). Following the sale, Adacom changed its name to Harris Adacom Corporation (HAC). Byrne, who had been employed by Harris, left Harris to become president of HAC.

In June 1992, HAC formed Harris Adacom Network Services, Inc. (HANS)[2], a wholly-owned subsidiary. HAC contributed its North American computer network services to HANS in exchange for 100 percent of HANS' stock. In April 1993, HAC formed Harris Adacom Corporation, B.V. (HACBV), another wholly-owned subsidiary, in the Netherlands. HAC transferred substantially all of its assets, including its HANS stock, to HACBV in exchange for HACBV's assumption of the HAC promissory notes originally owed by HAC to Harris by virtue of the Adacom acquisition. Following this transaction, HAC was the parent of HACBV and, in turn, HACBV was the parent of HANS.

On April 5, 1993, before HACBV was formed, Moti Gura, chairman of HAC's board of directors, sent Byrne a memorandum explaining that HAC would issue to Byrne HACBV stock in exchange for Byrne's HAC stock. In addition, Gura

---

1. Harris is a Delaware Corporation duly registered to conduct business in the State of Texas.

2. HANS is a Delaware Corporation duly registered to conduct business in the State of Texas.

agreed that if Byrne sold HANS, HACBV would redeem Byrne's HACBV stock for between $2.9 million and $4.5 million. Gura and Byrne exchanged several subsequent memos dated in April setting forth the terms of this "Redemption Agreement" (the April Memos).

In June 1994, Harris filed an involuntary bankruptcy petition against HACBV in the Netherlands because HACBV had not paid the notes that it had assumed. Rutger J. Schimmelpenninck and J.P. Jongepier were appointed as curators, or trustees in the bankruptcy. In August 1994, Schimmelpenninck and Byrne met in Dallas to discuss Byrne's role with HANS. At the meeting, Schimmelpenninck appointed Byrne as HANS' sole director, and Byrne alleges that he and Schimmelpenninck agreed that Byrne would *prepare* HANS for sale in exchange for his regular salary. After the meeting, Byrne sent Schimmelpenninck a letter setting forth their agreement, stating that he would prepare HANS for a potential sale, and that severance and equity matters were to be the subject of separate communications with Schimmelpenninck. Byrne alleges that by "equity matters," he referred to the $2.9 million redemption agreement. In response, Schimmelpenninck sent Byrne a letter confirming that Byrne's letter was a correct reflection of their agreement (the August Letter Agreement).

In October 1994, Schimmelpenninck, Byrne, and Harris' chief financial officer, Bryan Roub, met in Melbourne, Florida, Harris' principal office. Byrne alleges that at the Melbourne meeting, Schimmelpenninck requested that he *expedite* the sale of HANS and that he agreed, reminding Schimmelpenninck of his right to receive at least $2.9 million when he sold HANS. Byrne alleges that at the meeting and afterwards, Schimmelpenninck re-peatedly assured him that, on behalf of HANS, Schimmelpenninck would pay him, using the words "I will take care of you." In contrast, Schimmelpenninck alleges that the August Letter Agreement described the services Byrne would perform in connection with the sale of HANS and the remuneration Byrne would receive. He alleges that, as curator for HACBV, he never assured Byrne that he would "take care of" him and that he informed Byrne that his claim was at most an ordinary claim in the HACBV bankruptcy proceeding.

In February 1995, HANS, with the help of Byrne and others, sold all of its assets to Genicom, Inc. for approximately $20 million. Byrne asserts that once HANS was sold, HACBV and Schimmelpenninck rejected his demand for remuneration. The curators concede that Byrne performed services in connection with the sale, but insist that he was fully compensated pursuant to the August Letter Agreement. In April 1995, Schimmelpenninck removed Byrne as sole director of HANS. In August 1995, Byrne filed suit against HANS for reasonable compensation under a theory of *quantum meruit*. Thereafter, Byrne amended his petition adding four additional claims and adding Harris as a defendant. His claims against HANS included claims for breach of written contract, breach of oral contract, *quantum meruit*, and fraud. He also asserted a claim for fraudulent transfer against Harris, claiming that because HANS fraudulently transferred over $1.2 million to Harris, he was entitled to recover damages from Harris. Byrne's claim against HANS for breach of written contract, or breach of the "Redemption Agreement," was based on a theory that HAC, HACBV, and HANS were members of a single business enterprise.[3] The jury returned a ver-

---

3. Byrne contended that he and HAC entered the Redemption Agreement, vis-a-vis the April Memos. He contended that at a November 1993 HAC board meeting, HAC "approved, adopted, and ratified" the Redemption Agree-ment. He also contended that HAC reincor-porated or restructured the company such that HAC "became" HACBV. He contended that at the same November 1993 board meet-ing, the HAC board "approved HAC's reincor-

dict finding that HAC and HACBV were part of a single business enterprise with HANS, and that they caused HANS to be used for the purpose of perpetrating a fraud against Harris for their own personal benefit, i.e., to avoid paying Harris the amount still due on the notes from HACBV. However, the jury failed to find in favor of Byrne on any question seeking to establish liability against HANS. Consistent with the jury's findings, the trial court rendered a take-nothing judgment against Byrne.

Two years after Byrne filed his suit, the curators filed an ancillary proceeding in the United States Bankruptcy Court, requesting a declaration that any claims against HANS or other subsidiaries of HACBV based on a theory that HACBV was a member of a single business enterprise with, or the alter ego of, another person or entity, were the sole and exclusive property of HACBV, and also a preliminary injunction against the prosecution in this country of any action against HANS with respect to the property of HACBV. The bankruptcy court and district court denied the relief requested and enjoined HANS from transferring the funds to HACBV until the lawsuit was resolved. The curators appealed to the Fifth Circuit Court of Appeals. In July 1999, after the Byrne lawsuit was decided, the Circuit Court rendered judgment reversing the bankruptcy and district courts' ruling and granting a permanent injunction against Byrne precluding him from prosecuting the portions of his lawsuit that sought a money judgment against HANS on corporate veil-piercing grounds for

claims on which HANS was not purported to be directly responsible as the primary obligor. *In re Schimmelpenninck*, 183 F.3d 347 (5th Cir.1999). Byrne has filed a petition for rehearing. Byrne now appeals the state district court's take-nothing judgment, raising four points of error, all of which contend there was error in the jury charge.[4]

■ First, we consider Byrne's contention that the trial court erred in the jury charge by conditioning Byrne's breach of oral contract claim on an affirmative finding that the written Redemption Agreement existed. Jury Question 1 asked, "Did Byrne, Moti Gura, HAC and HAC B.V. agree to the terms of the Redemption Agreement?" By "Redemption Agreement" the court primarily referred to the April Memos in which HAC agreed to pay Byrne at least $2.9 million in exchange for Byrne's HAC stock and for his work selling HANS. In the heading preceding Question 5, the court instructed the jury that only if it answered "yes" to Question 1, should it answer Question 5. Question 5 asked "Did Byrne and HANS enter into an oral agreement in October 1994 under which Byrne would sell the assets of HANS on an expedited basis and HANS would compensate Byrne for the reasonable value of his services consistent with the remuneration set out in the Redemption Agreement?" The jury answered, "No" to Question 1 and so did not answer Question 5.

Byrne bases his argument on *Varme v. Gordon*, in which the Houston Court of Appeals stated, "If a conditional submission deprives a party of the affirmative

poration under the same name, Harris Adacom Corporation, B.V.—in the Netherlands" and also agreed that "HACBV would assume all of the outstanding obligations of HAC," which included the Redemption Agreement. Thus, HAC and HACBV were obligated by the Redemption Agreement. He further contended that HAC, HACBV, and HANS were part of a single business enterprise because they integrated their resources to achieve a common business purpose (the alleged reason for creating HANS was to build HANS' value and

then conduct an initial public offering, merger, or outright sale of HANS) and that the Redemption Agreement, because it was an obligation incurred in pursuit of the common business purpose, was an obligation of HANS.

4. Byrne originally asserted nine points of error, but at oral argument, his counsel stated that because of the Fifth Circuit Court's decision, he would no longer pursue any points pertaining to the Redemption Agreement.

submission of an issue raised by the pleadings and evidence, such conditional submission also constitutes reversible error." *Varme v. Gordon,* 881 S.W.2d 877, 881 (Tex.App.-Houston [14th Dist.] 1994, writ denied) (citing *Washington v. Reliable Life Ins. Co.,* 581 S.W.2d 153, 160 (Tex.1979)). Byrne contends that he asserted two separate and distinct breach of contract causes of action, one for breach of written contract and one for breach of oral contract. His cause of action for breach of written contract was premised on the Redemption Agreement, set out primarily in the April Memos, whereby HAC agreed to pay Byrne at least $2.9 million in exchange for Byrne's HAC stock and for his selling HANS.[5] His cause of action for breach of oral contract was premised on his agreement with Schimmelpenninck formed at the Melbourne meeting during which Schimmelpenninck allegedly stated, on behalf of HANS, that HANS would compensate Byrne in a manner consistent with the Redemption Agreement in exchange for Byrne's expediting the sale of HANS. Byrne contends that he pleaded breach of oral contract as an independent claim and supported that claim with some evidence of the existence of an oral contract, its breach, and resulting damages. He argues, therefore, that under *Varme v. Gordon,* the trial court committed reversible error by conditioning Question 5 on Question 1.

In contrast, HANS claims the conditioning was proper, arguing that Byrne must have secured an affirmative finding on Question 1, which asked whether the Redemption Agreement existed. Question 1, asking whether the parties agreed to the terms of the Redemption Agreement, in effect asked whether the parties agreed to the terms set out in the April Memos such

that a written agreement, the Redemption Agreement, was actually formed between the parties, or that it existed. Contrary to HANS' argument, Byrne was not required to prove, as a basis for proving his oral contract, that the written agreement was actually formed or existed. Rather, he had to show only that the April Memos setting out the terms of the alleged agreement existed. The oral contract, incorporating the terms of the April Memos, could have been valid even though Byrne was unable to prove that the parties entered into a written agreement containing such terms. Thus, under *Varme v. Gordon,* if Byrne's breach of oral contract theory was raised by the pleadings and evidence, the trial court erred in conditioning a finding of an oral contract on a finding that the parties had a written agreement containing the same terms.

The rule of *Varme v. Gordon,* however, is limited by the Supreme Court's holding in *Exxon Corp. v. Perez,* in which the Texas Supreme Court stated, "So long as matters are timely raised and properly requested as part of a trial court's charge, a judgment cannot be permitted to stand when a party is denied proper submission of a *valid* theory of recovery...." *Exxon Corp. v. Perez,* 842 S.W.2d 629, 631 (Tex. 1992) (emphasis added). We must, then, decide if Byrne's breach of oral contract theory was valid. The jury's finding that an oral contract did not exist answers our inquiry. Byrne contends that he and Schimmelpenninck effected an oral agreement to adopt the terms set out in the April Memos when he explained the terms to Schimmelpenninck and Schimmelpenninck replied by saying, "I will take care of you." Jury Question 15, the only question related to Byrne's breach of oral contract claim, asked, "Did Rutger J. Schimmelpen-

---

**5.** Byrne alleged not only that the Redemption Agreement was reflected in the April Memos, but also that the following documents demonstrated that HACBV became a party to the agreement: (1) minutes of a November 1993 HAC board meeting, (2) an "exchange offer memorandum," a memorandum in which

HAC gave its shareholders the option to remain HAC shareholders or exchange their HAC shares for stock in HACBV or ATL, an Israeli corporation in which HAC was the majority shareholder, and (3) an "assumption agreement," an agreement in which HACBV assumed all of HAC's contracts and liabilities.

ninck make the following statement to Byrne, 'I will take care of you?'" The jury answered, "No." The jury's negative answer means that the jury found that Schimmelpenninck did not make the statement claimed to be the basis of the oral agreement. Thus, it effectively found that there was no oral agreement. Because the jury found there was no oral agreement, any error resulting from the court's conditioning Question 5 on Question 1 is harmless.

■ Byrne also contends that the trial court abused its discretion by including an improper instruction in the jury charge that prevented him from securing an affirmative finding on his *quantum meruit* claim. In an alternative to his contract claims, Byrne sought to recover compensation under a *quantum meruit* theory of recovery for the work he did in selling HANS. Byrne argues that HANS accepted his services with the knowledge that he expected to be compensated in addition to his salary. Byrne contends that the court erred by instructing the jury that any ambiguity in letters written by Byrne to Schimmelpenninck must be construed against Byrne. Byrne contends that although the instruction is a *correct* statement of the law, it discouraged the jury from carefully weighing and analyzing the evidence of the parties' intentions, and in any event, construction of contract language should not have been submitted to the jury. In his objections to the trial court, however, Byrne complained simply that the "instruction concerning the construction of ambiguities in the August 22nd, 1994 letter is an *incorrect* statement of the law. The letter should not be construed against Byrne. The construction language should not be included in the instruction." (Emphasis added.) Although Byrne argues that the last sentence of his statement to the trial court is broad enough to have preserved an additional objection that the construction of

contract language should in no event be submitted to the jury because it is a matter of law for the court, we disagree. We believe the last statement of Byrne's objection was made merely in support of his true objection, which he set forth in his first sentence. Because Byrne's objection at trial differs from his complaint on appeal, Byrne has not preserved any error for appellate review. *Nelson v. State*, 607 S.W.2d 554, 555 (Tex.Crim.App. [Panel Op.] 1980). Moreover, if it is doubtful whether the last sentence includes Byrne's present objection, Byrne has failed to preserve error by failing to point out distinctly to the trial court the objectionable matter and the grounds of the objection, as required by TEX.R. CIV. P. 274. *First Am. Title Ins. Co. v. Adams*, 829 S.W.2d 356, 360–61 (Tex.App.-Corpus Christi 1992, writ denied).

■ Byrne also contends that the trial court abused its discretion by submitting his fraud claim as a special issue rather than in broad form, in violation of Texas Rule of Civil Procedure 277.[6] In addition to his oral contract claim, Byrne also asserted a fraud claim based on Schimmelpenninck's alleged oral promise that he would take care of Byrne consistent with the terms of the Redemption Agreement. Question 15 asked, "Did Rutger J. Schimmelpenninck make the following statement to Byrne, 'I will take care of you?'" The jury answered, "No" and so did not answer Question 16, which asked, "Did HANS commit fraud against Byrne in connection with the statement you have found in response to Question No. 15?" Byrne contends that the trial court abused its discretion in submitting Question 15 because, citing *Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647 (Tex.1990), his case does not present the "extraordinary circumstances" that would have permitted the trial court to deviate from Rule 277's requirement for broad-form questions. He further contends that the error was

---

6. Rule 277 provides in pertinent part, "In all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions." TEX.R. CIV. P. 277.

harmful because it required the jury to determine whether Schimmelpenninck used the precise language, "I will take care of you." Byrne argues that the court's charge forced the jury to answer Question 15 in the negative even if the jury concluded that Schimmelpenninck promised Byrne he would be compensated for his work using words *other than* "I will take care of you."

Texas Rule of Civil Procedure 278 provides that the written pleadings and the evidence dictate what questions, instructions, and definitions are proper for the jury. Rule 278 states, "The court shall submit the questions, instructions and definitions in the form provided by [Texas Rule of Civil Procedure] Rule 277, which are raised by the written pleadings and the evidence." TEX.R. CIV. P. 278. Texas Rule of Civil Procedure 277 then determines the form of those questions. Effective January 1, 1988, the Texas Supreme Court amended Rule 277 to provide that "[i]n all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions." TEX.R. CIV. P. 277. In *Texas Dep't of Human Servs. v. E.B.*, the Texas Supreme Court recognized that by deleting certain language from Rule 277, it had "eliminated trial court discretion to submit separate questions with respect to each element of a case." *Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d at 649. The court interpreted "whenever feasible" to mean "in any or every instance in which it is capable of being accomplished," and reiterated its preference for broad-form submission, stating, "Unless extraordinary circumstances exist, a court must submit such broad-form questions." *Id.* The Texas Pattern Jury Charges note that "the term 'extraordinary circumstances' would seem to contemplate only a situation in which the policies underlying broad-form questions would not be served." 4 Mc-Donald Texas Civil Practice § 22:15 (1992) (quoting 1 State Bar of Texas, Texas Pattern Jury Charges PJC 4.01 (1991)). The Texas Supreme Court has noted the policies that broad-form questions promote: They reduce appeals, avoid retrials, and expedite trials by simplifying the charge conference and making questions easier for the jury to comprehend and answer. *Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d at 649. In addition, submitting alternative liability standards when the governing law is unsettled might very well be a situation where broad-form submission is not feasible. *Westgate, Ltd. v. State*, 843 S.W.2d 448, 458 n. 6 (Tex.1992).

Although the Supreme Court has clearly mandated broad-form submission, it has also made clear that the standard of review for charge errors is abuse of discretion. *See Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d at 649. Thus, the trial court has at least some discretion to determine whether broad submission is feasible or whether extraordinary circumstances exist. Moreover, if broad submission is feasible, the trial court abuses its discretion by failing to submit the issues broadly, but such error is not reversible *per se. See, e.g., H.E. Butt Grocery Co. v. Warner*, 845 S.W.2d 258, 260 (Tex.1992), where the court held that the trial court should have submitted the issues broadly but failure to do so was not harmful error; *see also Westgate, Ltd. v. State*, 843 S.W.2d at 458. To determine whether the error is reversible, we consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety. *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex.1986). The error is reversible only if, when viewed in the light of the totality of these circumstances, the error was reasonably calculated to and probably did cause the rendition of an improper judgment. *Id.;* TEX.R.APP. P. 44.1(a).

HANS relies on *Miller v. Wal-Mart Stores, Inc.*, 918 S.W.2d 658 (Tex.App.-Amarillo 1996, writ denied), for its contention that the trial court does not abuse its discretion by submitting questions that address the controlling issue in a case. We note that in *Miller* the Amarillo Court of

Appeals reviewed the pleadings, the evidence, and the charge in its entirety, not to determine whether the alleged error was reversible but to determine whether the trial court had abused its discretion. *See Miller v. Wal–Mart Stores, Inc.*, 918 S.W.2d at 664. The court held that where the appellant sued for negligence based on Wal–Mart's sale of ammunition to the appellants' son, a jury question asking whether Wal–Mart sold ammunition to the appellants' son was a proper submission of the controlling issue raised by the pleadings and evidence. *See id.* Thus, the court effectively held that the case presented an extraordinary circumstance or a situation in which broad-form submission was infeasible. The court further held that the alleged error did not amount to such a denial of the appellants' rights as was reasonably calculated to, and probably did, cause the rendition of an improper judgment. *See id.* Although we are left with little to guide us in our determination of what constitutes an "extraordinary circumstance," the Supreme Court's repeated expression of its preference for broad-form questions leads us to believe that this case fails to present such extraordinary circumstances that would make broad-form submission infeasible.

■ We now will consider Byrne's pleadings, the evidence, and the charge in its entirety to determine whether the error in submitting Question 15 is reversible. Question 15 asked, "Did Rutger J. Schimmelpenninck make the following statement to Byrne, 'I will take care of you?'" Byrne alleged fraud for the first time in his first amended original petition, in which he pleaded the following:

> In entering into the oral agreement with Byrne in October 1994, and in promising Byrne "I will take care of you," RJS [Schimmelpenninck] acted as the agent of at least HANS and Harris. That promise was false when made in that RJS did not have the intention to perform the promise. The promise was material to Byrne and he reasonably

relied upon that promise. By making that promise to Byrne, RJS, as agent for HANS and Harris, worked a fraud upon Byrne for which HANS and Harris are liable.

Byrne's second, third, fourth, and fifth amended original petitions used the same pleading. The only act of fraud alleged in any of Byrne's pleadings is Schimmelpenninck's alleged statement, "I will take care of you." Because Byrne voluntarily limited his pleaded cause of action to this specific statement, he had the burden to prove that Schimmelpenninck made the statement. The record reflects that Byrne repeatedly testified that Schimmelpenninck promised him he would pay him by saying, "I will take care of you." HANS, attempting to impeach Byrne, presented a minor amount of evidence that could be construed to the contrary. On cross-examination, HANS' counsel attempted to impeach Byrne with his deposition testimony in which Byrne stated, "There was a comment made *that I felt said* 'Yes, I will take care of you.'" (Emphasis added.) The majority of evidence, however, clearly shows that Byrne's contention was that Schimmelpenninck made a promise to Byrne using only the exact words, "I will take care of you." In answer to HANS' attempted impeachment, Byrne repeated that he had been directly quoting Schimmelpenninck. In addition, Byrne's attorney responded by reading into the record the remaining portions of Byrne's deposition testimony in which Byrne quoted Schimmelpenninck as stating, "I would like to review all of these documents with my colleagues, but you've done a good job and I will take care of you." Byrne's attorney also read into the record the portion of Byrne's deposition testimony in which he asked Byrne for clarification: "So your testimony is that upon receiving this seventy-six pages of claims and having the conversation you just described, Schimmelpenninck said, quote, 'I will take care of you,' close quote, right?" Byrne answered, "Yes."

Byrne contends that Question 15 was harmful because it required the jury to determine whether Schimmelpenninck used the precise language, "I will take care of you." Byrne argues that the jury had to answer Question 15 in the negative even if it concluded that Schimmelpenninck promised Byrne he would be compensated for his work using words other than "I will take care of you." Nevertheless, having reviewed the pleadings, the evidence, and the charge, we believe the controlling issue for the jury was not whether Schimmelpenninck made a promise to Byrne, but more specifically whether Schimmelpenninck made the specific promise to Byrne that "I will take care of you." We therefore hold that, although the trial court abused its discretion in failing to submit the issue broadly, Question 15, asking whether Schimmelpenninck made the statement "I will take care of you," fairly submitted to the jury the disputed fact issue. Moreover, we find that Byrne has suffered no harm. Byrne himself specifically pleaded and repeatedly testified that Schimmelpenninck made a promise using only the words "I will take care of you." He cannot now show that he has suffered harm because the jury found that specific issue against him.

■ In his fourth point, closely related to point three, Byrne contends that the trial court abused its discretion by improperly conditioning Question 16, a broad-form fraud question, on Question 15. As we have noted, Question 15 asked whether Schimmelpenninck said to Byrne, "I will take care of you." Question 16, which was conditioned on an affirmative finding to Question 15, asked, "Did HANS commit fraud against Byrne in connection with the statement you have found in response to Question No. 15?" Because the jury answered "No" to Question 15, it did not answer Question 16.

Byrne did not object to Question 16 on the ground that it was improperly conditioned on Question 15.[7] HANS complains that in addition to Byrne's failure to object, Byrne did not submit a proper broad-form fraud question and obtain the court's signed, written refusal necessary to preserve error under Texas Rule of Civil Procedure 276 and 278.[8] Byrne contends that because he objected that Question 15 was too narrow and thus was an improper submission of his fraud claim, he necessarily objected that Question 16, a broad-form fraud question, was improperly conditioned on Question 15. He also contends that because Question 16 was a broad-form fraud question that already had been included in the charge, he was not required to submit a broad-form fraud question.

■ Byrne complains not that the court failed to submit a broad-form fraud question, but that the board-form fraud question submitted was defective. Errors in questions or issues actually submitted may be preserved by objection, and failure to request the submission of correct ones does not waive the error. *Vela v. Alice Specialty Co.* 607 S.W.2d 289 (Tex.Civ. App.-Tyler 1980, no writ). Indeed, one must object to conditional submissions in order to complain of the matter on appeal. *Strauss v. LaMark,* 366 S.W.2d 555, 557 (Tex.1963). Question 16 was actually submitted, but it was submitted conditionally. Byrne was not required to request the submission of a broad-form fraud question, but only to object to the alleged error.

---

7. Byrne objected to an instruction included in Question 16 regarding agency law.

8. Rule 278 provides, "Failure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment...." Tex.R. Civ. P. 278. Rule 276 provides, "When an instruction, question, or definition is requested and the provisions of the law have been complied with and the trial judge refuses the same, the judge shall endorse thereon 'Refused,' and sign the same officially.... [S]uch procedure shall entitle the party requesting the same to have the action of the trial judge thereon reviewed...." Tex.R. Civ. P. 276.

Byrne contends that because he objected to Question 15 on the ground that it was too narrow, his objection should be construed to also include an objection that Question 16 was improperly conditioned on Question 15. Texas Rule of Civil Procedure 274 provides, however, that an objection to the charge must point out distinctly the objectionable matter and the grounds of the objection. *See* TEX.R. CIV. P. 274. The purpose of this rule is to afford the trial courts an opportunity to correct errors in the charge by requiring objections to clearly specify the error and explain the grounds for objection. *First Am. Title Co. v. Adams,* 829 S.W.2d at 360–61. An objection that does not meet both requirements is properly overruled and will not preserve error on appeal. *Id.* at 361. Byrne has not provided us with any authority providing that a party must object to a question conditionally submitted *unless* the party has already objected to the question on which the question complained of was conditioned. Because Byrne failed to object to Question 16 on the ground that it was conditionally submitted on Question 15, we find that he waived his objection.

Even were we to conclude that Byrne preserved the alleged error, we can find no harm in the trial court's conditional submission of the broad-form fraud question on Question 15. As we have noted, to prove his fraud claim, Byrne specifically pleaded and repeatedly testified that Schimmelpenninck made a promise using only the words "I will take care of you." The alleged statement was a necessary element of Byrne's fraud claim. Byrne cannot now show that he has suffered harm as a result of the trial court's conditioning his fraud claim on an affirmative finding that Schimmelpenninck made the statement that Byrne asserts is the basis of his fraud claim.

For the reasons stated, the judgment of the trial court is affirmed.