Opinion issued June 17, 2010.

 

 



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-09-00099-CV

———————————

Ahmad Suleiman and Ghadeer Bataineh, Appellants

V.

The Texas
Department of Public Transportation, Appellee



 



 

On Appeal from the 412th District Court

Brazoria County, Texas



Trial Court Case No. 36997

 



 

MEMORANDUM 
OPINION

          Appellants, Ahmad
Suleiman and Ghadeer Bataineh, appeal from a final judgment, rendered after a
jury trial, that awarded them damages for a partial taking of their property by
appellee, the Texas Department of Transportation (“TxDOT”).  In two issues, appellants contend that (1)
the evidence was factually insufficient to support the amount of damages
awarded under their inverse condemnation claim and (2) the trial court erred in
granting TxDOT’s jurisdictional plea on their claims against TxDOT based on trespass,
in which they sought certain consequential damages.  We affirm.

BACKGROUND

          Appellants are husband and wife.  In 2005, TxDOT was expanding State Highway
35.  As part of that expansion project,
TxDOT needed to widen the intersection of Highways 35 and 36.  Appellants’ residence was at this
intersection.  J.D. Abrams, L.P.
(“Abrams”) was TxDOT’s contractor for the construction.

          The dispute underlying this case
concerned the size of TxDOT’s right of way along the highways and at the edge
of appellants’ property.  TxDOT contended
that a perimeter fence around appellants’ home lay in that right of way; appellants
contended that their fence lay outside TxDOT’s right of way, i.e., that the right of way was not as
deep as TxDOT contended.  TxDOT had
right-of-way maps dating back to the 1930s to support its claim, although it
could not locate deeds to support those maps; appellants had a deed to support
their claim and could show that some of the ground monuments mentioned in that
deed appeared on their property.  

          In May 2005, Abrams employees
approached Suleiman to advise that part of his fence was in TxDOT’s right of
way and that he needed to remove this portion, or they would do so.  In response, Suleiman produced his deed,
showing that he owned the disputed property. 
On May 31, 2005, as appellants were preparing to depart on a summer-long
trip to Jordan, Abrams employees advised Suleiman that this portion of his fence
would be removed, and they in fact removed it. 
In August 2005, Suleiman and his sons returned, but his wife and
daughters remained in Jordan.  Although
appellants admitted at trial that they had already intended for their eldest
daughter to stay in Jordan to study for a year, they contended that they
decided to leave Bataineh and their remaining daughters in Jordan for an entire
year, as well, because they felt that the construction made the property unsafe
without a fence.  Before the four female
family members returned from Jordan the following summer, Suleiman had the
fence replaced at his own expense.

          At the end of August 2005, TxDOT
decided to condemn the land, explaining through its trial witnesses that it did
so because it could find no deed to underlie its right-of-way claim.  Appellants sued TxDOT in the 412th District
Court of Brazoria County for inverse condemnation and trespass, including
Abrams as a defendant for the trespass claim. 
TxDOT later sued for condemnation in the County Court at Law No. 2 of
Brazoria County.  The parties eventually
agreed to transfer the condemnation case to the district court and to
consolidate the suits.  Additionally,
they agreed to allow TxDOT to continue with the construction pending these
suits’ resolution by its depositing $80,000 into the court’s registry.

          TxDOT filed a plea to the jurisdiction
on appellants’ claims for trespass and on any claim for inverse condemnation
that sought damages for emotional distress or the costs of the family’s living
overseas for a year.  The trial court
granted that plea before trial.

          The remaining claims were tried to a
jury, although appellants nonsuited Abrams part way through TxDOT’s case in
chief.  TxDOT did not contest its
liability to pay for the taken property or the fence, although it contested
their value.  The jury returned a verdict
awarding appellants $125,810.75 in total damages for the taking, including the
costs to replace the entire fence and to rebuild part of a damaged canopy, and
the trial court rendered judgment accordingly, along with awarding title of the
relevant portion of appellants’ property to TxDOT.  

FACTUAL SUFFICIENCY

          In their first issue, appellants
contend that there was factually insufficient evidence to support the jury’s
answer to Jury Question No. 2, which asked for the damages to the remainder of
the Suleiman property due to TxDOT’s partial taking.

A.      The
Charge

          The question to which appellants
object must be considered in light of the whole charge, which contained only
two questions.  

          Jury Question No. 1 provided:

What do you find to be the market value of the
Suleiman property taken by TxDOT, as of March 15, 2006, considered as severed
land?

 

The jury answered: “$112,263.75.”

 

          Jury Question No. 2 then provided:

          In
answering Question No. 2, you are instructed that you shall determine the
damages, if any, by considering the difference between (a) the Market Value of
the Suleiman property before the taking, and (b) the Market Value of the
remainder of the Suleiman property after the taking, giving consideration to
the uses to which the taken part is to be subjected.

 

QUESTION NO. 2

 

          What do
you find to be the damages, if any, to the Suleiman property?

 

The
jury answered: “$13,547.00.”  

B.      The
Standard of Review

          When, as here, a party attacks the
factual sufficiency of an adverse finding on an issue on which it had the
burden of proof, the party must demonstrate that the adverse finding is against
the great weight and preponderance of the evidence. Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001).  A reviewing court must consider and weigh all
of the evidence and can set aside a verdict only if the evidence is so weak or
the finding is so against the great weight and preponderance of the evidence as
to be clearly wrong and unjust.  Id.  The fact finder is the sole judge of witnesses’
credibility and the weight to be given their testimony, and the fact finder may
choose to believe one witness over another.  Golden
Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003). Because it
is the fact finder’s province to resolve conflicting evidence, we must assume
that the fact finder resolved all evidentiary conflicts in accordance with its
decision if a reasonable human being could have done so.  See id.  An appellate court may not impose its own
opinion to the contrary of the fact finder’s implicit credibility
determinations.  Id.  When a party does not
object to a jury question or instruction, we measure the sufficiency of the
evidence against the charge or instruction that was actually given.  E.g.,
St. Joseph Hosp. v. Wolff, 94 S.W.3d
513, 530 (Tex. 2002); Murphy v. Am. Rice,
Inc., No. 01-03-01357-CV, 2007 WL 766016, at *16 (Tex. App.—Houston [1st
Dist.] Mar. 9, 2007, no pet.) (memo. op.).

C.      The
Law

          Article I, section 17 of the Texas
Constitution provides that “[n]o person’s property shall be taken, damaged or
destroyed for or applied to public use without adequate compensation being made
. . . .”  Tex. Const. art. I, § 17. 
The Texas Supreme Court “has long held that the measure of compensation
in a partial-takings case is the market value of the part taken plus damage to
the remainder caused by the condemnation.” 
Westgate Ltd. v. State, 843
S.W.2d 448, 456 (Tex. 1992). 
Accordingly, even if the partial taking increases the remainder’s value,
the landowner is entitled to at least the market value of the portion that is
taken.  Id.

          “Generally, the government compensates
the owner before appropriating property, either by paying a mutually agreed
price or by paying the value as determined in a statutory condemnation
proceeding.”  Id. at 452.  “If, however,
the government appropriates property without paying adequate compensation, the
owner may recover the resulting damages in an ‘inverse condemnation’ suit.”  Id.  “An inverse condemnation may occur when the
government physically appropriates or invades the property, or when it
unreasonably interferes with the landowner’s right to use and enjoy the
property, such as by restricting access or denying a permit for development.”  Id.  “To recover on an inverse condemnation
claim, a property owner must establish that ‘(1) the State intentionally performed
certain acts, (2) that resulted in a “taking” of property, (3) for public
use.’”  S.W. Bell Tel., L.P. v. Harris County Toll Rd. Auth., 282 S.W.3d
59, 61 (Tex. 2009) (quoting Gen. Servs.
Comm’n v. Little-Tex Insulation Co., 39 S.W.3d 591, 598 (Tex. 2001)).  

D.      Discussion

          Both parties presented expert
appraisers: Barry Coleman for appellants, and Alan Dominy for TxDOT.  These experts agreed that appellants’
property’s highest and best use was as commercial site, despite its current use
as a residence.  Based on this use,
Coleman opined that the per-square-foot value of the property’s taken portion
was $132,075, while Dominy testified that it was $74,826.  As for the per-square-foot value of the
remainder after the taking, Coleman testified that he assessed the same value
to it ($15) as he had for the whole property before the taking, and Dominy
concurred that the remainder’s value had not been diminished by the taking,
although he gave a per-square-foot value of $8.50.  

          Because both experts had already
concluded that there was no diminution in the remainder’s market value due to
the taking, they further opined that the only damage to the remainder was the
cost to replace the entire fence (both experts) and the cost to remove a canopy
(Coleman only).  The range given for the
total cost to replace these items was between $7,500 (Dominy) and $16,592
(Coleman).  Coleman admitted that his
calculations for the total taking did not include any damages that might be
associated with trespass or “other harm that Mr. Suleiman might have
experienced,” such as loss of use of the property.  

          As for total damages owed to
appellants for the taking (i.e., the
value of the portion taken plus the cost to replace the fence or fence and canopy),
Dominy testified to $82,639, while Coleman testified to $148,667.

          The jury’s answer to Jury Question No.
1 reflected a value ($112,263.75) that was within the range provided by the
parties’ experts for the portion of appellants’ property that was taken.  Its answer to Jury Question No. 2 likewise
reflected a value ($13,547) that was within the range provided by the experts
for the costs of replacing the fence and canopy—the only damages that either expert
identified to the remainder from the taking. 
The trial court rendered judgment on the total of these two values
($125,810.75), representing the market value of the portion taken and the
damage to the remainder caused by the condemnation.  See Westgate,
843 S.W.2d at 456 (indicating that proper “measure of compensation in a
partial-takings case is the market value of the part taken plus damage to the
remainder caused by the condemnation.”).

          The only evidence that the remainder
depreciated in market value after the taking came from Suleiman, testifying as
a lay witness, that the remainder depreciated from $25 per square foot before
the taking to $15 per square foot after the taking, a difference of $430,000 in
total value.[1]  The jury was free to accept the experts’
valuation testimony and to reject Suleiman’s lay testimony to the
contrary.  Moreover, his testimony does
not render the jury’s total damages award so against the great weight and
preponderance of the evidence as to be clearly wrong and unjust.  

          Appellants nonetheless argue that the
jury’s answer is factually insufficient because “the answer to [Jury] Question
No. 2 must be at least equal to the damages found in [Jury] Question No. 1,”
rendering the answers “in fatal conflict.” 
They argue that the trial court’s interpreting the answer to Jury
Question No. 2 as the amount of damage to the remainder, then adding that sum
to the value reached in answer to Jury Question No. 1 (the value of taken
property) to determine the total sum due appellants for the taking, was error.  They urge this because Jury Question No. 2
did not ask for the damage to the remainder, but instead asked for the
difference between the market value of the entire property before any taking
and the market value of the remainder after the taking.

          First, to the extent that appellants
complain about an alleged fatal conflict in the jury’s answers to the two
questions, that complaint is waived for their failure to have raised it before
the jury was discharged.  See Oyster Creek Fin. Corp. v. Richwood Inv.
II, Inc., 176 S.W.3d 307, 324 (Tex. App.—Houston [1st Dist.] 2004, pet.
denied) (holding that complaint that jury findings irreconcilably conflict is
waived if it is not made before jury is discharged).

          We begin with the charge given because
appellants did not object to it on this basis. 
See Wolff, 94 S.W.3d at 530; Murphy, 2007 WL 766016, at *16.  The two questions were in a form approved by
the Texas Supreme Court for determining damages in a partial-taking case “when the
part taken does not constitute a separate economic unit”:

[F]irst, the market value of the part taken,
considered as severed land, and second, the damages to the landowner’s
property, accompanied by an instruction that such damages should be determined
by considering the difference between a) the value of the landowner’s entire
tract before the taking, and b) the market value of the remainder after the
taking, giving consideration to the uses to which the condemned part is to be
subjected.

 

Westgate, 843 S.W.2d at 457 (constructing
broad-form question from special-issue submission previously approved in Uselton v. State, 499 S.W.2d 92 (Tex. 1973)).  Importantly for understanding the issue
before us, the Westgate court
explained the special-issue origin of this broad-form submission and its
purpose:

We approved the following [special-issue] questions in
Uselton: 1) the market value of the
part taken, considered as severed land; 2) the market value of the entire tract
before the taking; and 3) the market value of the remainder after the taking,
giving consideration to the uses to which the condemned part is to be
subjected.  Under this approach, the
total measure of damages is usually the difference between questions 2 and 3;
however, if this difference is less than the answer to question 1 (indicating
that the condemnation increased the value of the remainder), the landowner is
entitled to the market value of the part taken. 
The Uselton approach is
preferable where the part taken is small or irregularly shaped because it
focuses on the difference between larger, more easily valued tracts. The jury
is still asked to determine the market value of the part taken, but this amount
will be significant under the Uselton
approach only where the condemnation increases
the value of the remainder.  It is only
in those cases that the total diminution in value of the landowner’s property
will be less than the value of the part taken.  If there is no evidence of such an increase
[in the value of the remainder due to the partial taking], the first Uselton
question would generally not need to be submitted.

 

Westgate, 456-57 (footnotes and some
citations omitted) (underlining added).  

          Here, no evidence indicated that the
value of the remainder had increased due to the taking, and thus Jury Question
No. 1 was not necessary.  See id. at 457.  The trial court nonetheless submitted the two
questions, and neither party objected.

          The jury clearly understood Jury
Question No. 1 to ask for the value of the portion of appellants’ property that
was taken, and Jury Question No. 2 to ask for the damages to the remainder of
the property due to the taking.  The
total that it awarded was $125,810.75, and that sum was supported by the
evidence.  This was all that the trial court
could have rendered in damages anyway without giving appellants a double
recovery, even had the jury answered as appellants contend that it should
have.  Put in representative terms, what
the jury found was X for Jury Question No. 1 and Y for Jury Question No. 2, for
a total of X + Y, which is what the trial court awarded.  Had the jury awarded X for Jury Question No.
1 and X + Y for Jury Question No. 2, as appellants argue that it should have,
the trial court could have rendered judgment on only X + Y in any event.  Appellants’ argument, in essence, is that the
evidence supporting the findings is somehow rendered factually insufficient
because the jury did not render the full amount of compensation in one answer,
even though the jury’s answers, taken together, did so and were supported by
the evidence.  We reject such a
contention.  

          We overrule issue one.

PLEA TO THE JURISDICTION

          In issue two, appellants argue that
the trial court erred in granting TxDOT’s plea to the jurisdiction, which
“denied [them] consequential damages resulting from TxDOT’s trespass.”  

 

 

A.      The
Standard of Review and the Law Relevant to Jurisdictional Pleas

          We review de novo a trial court’s
ruling on a jurisdictional plea, construing the pleadings in the plaintiff’s favor
and looking to the pleader’s intent.  See Tex.
Natural Res. Conservation Comm’n v. IT-Davy, 74 S.W.3d 849, 855 (Tex.
2002); Tex. Ass’n of Bus. v. Tex. Air
Control Bd., 852 S.W.2d 440, 446 (Tex. 1993).

           “A plea to the jurisdiction is a dilatory
plea, the purpose of which is to defeat a cause of action without regard to
whether the claims asserted have merit.” Bland
Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 554 (Tex. 2000). Although the
plaintiff’s claims may form the context against which the jurisdictional plea
is determined, the plea generally “should be decided without delving into the
merits of the case.”  Id. 
“[A] court deciding a plea to the jurisdiction is not required to look
solely to the [plaintiff's] pleadings but may consider evidence and must do so
when necessary to resolve the jurisdictional issues raised.”  Id.
at 555.  However, in general, “the proper
function of a dilatory plea does not authorize an inquiry so far into the
substance of the claims presented that plaintiffs are required to put on their
case simply to establish jurisdiction.”  Id. at 554.  “If the evidence creates a fact question
regarding the jurisdictional issue, then the trial court cannot grant the plea
to the jurisdiction, and the fact issue will be resolved by the fact finder.
However, if the relevant evidence is undisputed or fails to raise a fact
question on the jurisdictional issue, the trial court rules on the plea to the
jurisdiction as a matter of law.”  Tex. Dep’t of Parks & Wildlife v.
Miranda, 133 S.W.3d 217, 227-28 (Tex. 2004).

B.      Discussion

          Appellants’ third amended petition,
their “live” pleading at the time of the jurisdictional plea’s filing, alleged in
relevant part claims for inverse condemnation, trespass, and “Violation of the
Tort Claims Act.”  In support of these
last two allegations, appellants alleged as follows:

TRESPASS

          Defendants,
through their Agents or employees, have routinely trespassed upon Plaintiffs’
land during their work activities.  They
have removed Plaintiffs’ fence, placed excavation dirt, equipment and materials
on Plaintiffs’ land and routinely interfered with Plaintiffs and their family
in the enjoyment of their property.  The
defendants have created a situation so dangerous that Mr. Suleiman and his sons
were forced to live apart from his daughters and their mother for the family’s
safety.

 

. . .

 

VIOLATION OF TORT CLAIMS
ACT

 

          In
carrying out their wrongful acts TxDOT employees and their agents used
motor-driven equipment.  They caused
damage to Plaintiffs’ property by:

 

          1)      Causing severance of water utilities to
their residence.

 

          2)      Removing dirt and excavating on
Plaintiffs’ land.

 

          3)      Forcing
Plaintiffs to incur additional living expenses    during
the time the property was involved in construction.

 

          In the background section of their
petition, appellants alleged that TxDOT’s actions in entering their property,
removing the boundary fence, severing the utility connection, and beginning
construction activity on their property were “taken intentionally without
regard to investigation of the disputed ownership of the property” and that
“[i]n carrying out these wrongful actions, Defendants used motor-driven
equipment,” causing damage to the property, extreme mental anguish to
appellants, and significant costs for living expenses in Jordan.  Elsewhere in the petition, appellants alleged
that “[t]he actions taken by TxDOT . . . were done willfully and wantonly
without investigation into the disputed ownership claims and with knowledge,
actual or imputed, of the fact that TxDOT had no deeds to support its claim of
ownership.”  Appellants pleaded for
damages for the condemnation, for emotional distress and mental anguish, and
for “consequential damages.”  The third
amended petition was the first to reference the TTCA or the use of motorized
vehicles.

          Before appellants filed their third
amended petition, TxDOT had filed a jurisdictional plea, urging that (1)
appellants’ claim for trespass was barred under the Texas Tort Claims Act
(“TTCA”) because trespass was an intentional tort and (2) the takings clause of
the Texas Constitution did not waive immunity for the inverse condemnation
claim to the extent that it sought damages for mental anguish, emotional
distress, and consequential damages associated with the family’s living in
Jordan.  Appellants filed their third
amended petition on the same day that they filed their response to TxDOT’s
jurisdictional plea.  In their response,
appellants contended that (1) TxDOT’s agents used a motorized vehicle to remove
the fence, thus invoking the TTCA’s waiver of immunity from suit, an (2) their
“alternative living expenses and emotional distress” were “special damages”
recoverable under an inverse condemnation claim.  Appellants attached to their response
deposition testimony from Abrams’s project manager indicating that an excavator
was used to dig on their property.  Within
days of the filing of appellants’ response, TxDOT amended its answer to raise
defenses related to the TTCA: that appellants had failed to provide timely
notice and that their damages did not arise from the use of motor-driven
equipment.  

          The trial court held a hearing on the
jurisdictional plea before trial.  At
that hearing, the parties presented evidence as to whether motor-driven equipment
was used to remove the fence; what TxDOT knew about its claim to the right of
way, and when; and whether TxDOT actually knew that appellants’ family members
remainder in Jordan because of the construction.  The record contains no written ruling on the
plea, but at the close of the hearing, the trial court verbally ruled that it
was granting the plea “on the Tort Claims Act” against TxDOT based on “[t]wo
things.  Lack of notice.  The second is that it wasn’t clearly
established to me that motor driven equipment was used to pull the [fence]
posts out.”  Several months later, again
before trial, appellants filed a motion “To Reconsider Scope of Tort Claims Act
Cause of Action,” attaching in support an affidavit from a relative that the
fence’s posts had been pulled out by a tractor or backhoe.  The trial court advised the parties by letter
that it had denied that motion.

          Appellants nonsuited Abrams during
TxDOT’s case in chief, on the last day of trial testimony.  Until that point, they had presented evidence
relevant to their trespass claim against Abrams.  At the charge conference, appellants
submitted three relevant questions that the trial court refused: (1) whether
TxDOT had trespassed on appellants’ property; (2) whether appellants were
injured by that trespass, specifically, whether damages for “reasonable living
expenses incurred by Suleiman for the time, if any, that Suleiman and his
family could not enjoy the use of their property” existed; and (3) whether
TxDOT had actual notice that it was trespassing on appellants’ property when it
removed their fence.  Appellants
concurrently submitted a definition of trespass, which the trial court also
refused.

          On appeal, appellants contend that the
trial court erred in granting TxDOT’s jurisdictional plea on their claim for
consequential damages arising from TxDOT’s trespass because such damages are
recoverable under both the TTCA and the Texas Constitution.  

 

 

          1.       TTCA

          Appellants argue that the TTCA waived
sovereign immunity from suit for their trespass claim for damages because
TxDOT’s agents used a motor-driven vehicle to remove the fence posts.  Recognizing, as they did below, that they did
not provide TxDOT the notice required by the TTCA, appellants further contend
that their failure to give notice was excused because TxDOT had actual notice
of the damages.

          Nowhere in their brief do appellants
discuss TxDOT’s alternative ground in its jurisdictional plea: that as pleaded
here, trespass is an intentional tort for which the TTCA does not waive
immunity from suit.  We agree that this
basis supports the trial court’s ruling, even if it was not mentioned by the
court.  The live petition asserted that
the trespass was done “intentionally,” “willfully and wantonly,” and “with
knowledge.”  Likewise, appellants’
evidence submitted at the plea hearing—as at trial, before appellants
requested a jury question on their trespass claim—was that TxDOT had been informed, and
thus knew, several years before it committed this trespass that no deed
supported its claim to this right of way. 


          As alleged in this case, therefore,
trespass is an intentional tort.  The
TTCA expressly provides that sovereign immunity from suit is not waived for
intentional torts.  See Tex. Civ. Prac. &
Rem. Code Ann. § 101.057(2) (Vernon 2005).  Accordingly, this ground in the
jurisdictional plea supports the trial court’s ruling.  See
Harris County v. Cypress Forest Pub. Util. Dist. of Harris County, 50
S.W.3d 551, 553-54 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (holding that
TTCA’s waiver of immunity from suit did not extend to claim for trespass,
committed by dumping hazardous waste onto plaintiff’s property, because “trespass
is usually regarded as an intentional tort in the sense that it involves an
intent to commit an act which violates a property right, or would be
practically certain to have that effect, although the actor may not know that
the act he intends to commit is such a violation.”); State v. Gafford, No. 04-03-00168-CV, 2003 WL 22011302, at *4  (Tex. App.—San Antonio July 28, 2003, no pet.)
(memo. op.) (following Cypress Forest in
suit against TxDOT for trespass); Dillon
v. Jefferson County Sheriff’s Dep’t, 973 F. Supp. 628, 633 (E.D. Tex. 1997)
(holding that TTCA barred claim for trespass because, “[a]lthough not all
trespasses are intentional torts, plaintiff’s complaint outlines activities
that would be properly classified in that manner.”).

          2.       Special Damages Under the Texas
Constitution

          Appellants alternatively contend that,
even if immunity from suit barred the consequential tort damages sought under
their trespass claim, “TxDOT is not immune from tort damages resulting from [a]
violation of the Texas Constitution.”  Specifically,
appellants contend that these were special inverse-condemnation damages for
which the Texas Constitution waives immunity from suit.  Appellants urge that TxDOT “did not follow
the law as in a normal condemnation case” because it “caused the trespass . . .
knowing it did not have record title to the land . . . .”

          “Governmental immunity ‘does not
shield the State from an action for compensation under the takings
clause.’”  S.W. Bell Tel., L.P., 282 S.W.3d at 61 (quoting Gen. Servs. Comm’n, 39 S.W.3d at
598).  Generally speaking, “[d]amages in
condemnation proceedings are limited to damages to property.”  State
v. Walker, 441 S.W.2d 168, 173 (Tex. 1969). 
In assessing damages in a condemnation case, a court may not consider
“community injury”; it may, however, consider “special injury”
to the property.  See
Interstate Northborough P’ship v. State, 66 S.W.3d 213, 219 (Tex.
2001).  “In determining whether damages
are community or special, we stated that ‘[i]t is the nature of the injury
rather than its location that is critical in determining whether it is
community.’”  Id. (quoting State v. Schmidt,
867 S.W.2d 769, 781 (Tex. 1993)).  “While
injury to several landowners on the same street is not community injury simply
because they all suffer alike, it is also not special injury simply because
others farther away do not suffer at all.” 
Schmidt, 867 S.W.2d at 781.
The Texas Supreme Court has thus
identified “loss of improvements on the remainder due to condemnation”—here,
the fence and canopy—as compensable.  Id.
at 220.  Examples of other special damages
that the supreme court has identified include material and substantial impaired
access to the remainder property and change in distance from the street that results
in a loss of aesthetics due to a building’s special design.  See id.
at 220, 222.  

          When a governmental entity trespasses
on land before condemning part of it, the landowner is entitled to be made
whole for the diminished value of the portion taken when it is later
condemned.  Alexander v. City of San Antonio, 468 S.W.2d 797, 799 (Tex. 1971); Glade v. Dietert, 156 Tex. 382, 389, 295
S.W.2d 642, 646-47 (1956).  Specifically,
the land is valued as if no trespass had occurred.  Alexander,
468 S.W.2d at 799.  The underlying reasoning
for this rule is that the governmental entity “cannot be permitted to profit
from its own wrong when it seeks in a condemnation proceeding to pay only the
value of” land that was made less valuable by its very own trespass.  Id.
at 799-800.

          Appellants argue that damages for (1)
emotional distress and (2) the cost of living and schooling, both incurred when
half of the family lived in Jordan for a year because of the fence’s removal,
were recoverable special damages.  Appellants
cite no authority holding that emotional-distress damages, or damages for the
expense of housing and educational costs overseas, in a partial-takings case
are special damages for which compensation must be provided, even when trespass
is alleged, and we have found none.  Appellants
were fully compensated for the special damage of the canopy’s damage and the fence’s
loss; these were the only special damages to which they were entitled.

          3.       Holding

          We hold that the trial court did not
err in granting TxDOT’s jurisdictional plea. 
We overrule issue two.

CONCLUSION

          We affirm the judgment of the trial
court.

 

                                                                   Sherry
Radack

                                                                   Chief
Justice 

 

Panel
consists of Chief Justice Radack and Justices Bland and Sharp.

 











[1]           He
also testified that the portion taken was worth $220,125 (at $25 per square
foot), a value that the jury clearly rejected.